IN RE MURPHY'S ESTATE. MURPHY, RESPONDENT, *v.* NETT, APPELLANT.

(No. 2,925.)

(Submitted May 9, 1911. Decided May 27, 1911.)

[116 Pac. 1004.]

*Probate Proceedings—Will Contest—Undue Influence—Insanity —Burden of Proof—Presumptions—Instructions—Evidence— Depositions—Inadmissibility—Appeal and Error — Assignments of Error—Briefs.*

Appeal—Assignments of Error—Briefs.
1. An error not assigned in appellant's brief will not be considered on the appeal.

Will Contest—Undue Influence—Insanity.
2. In a legal sense, undue influence in the making of a will cannot be exerted upon one who is so far insane or unconscious as to be destitute of testamentary capacity.

Same—Undue Influence—Insanity—Inconsistent Findings—Effect.
3. Findings made in a case involving the probate of a will, (1) that testator was incompetent to make a will, and (2) that he executed the instrument while under undue influence, though involving illogical conclusions under the rule declared in paragraph 2 *supra, held* not so far inconsistent as to require the rendition of different decrees mutually destroying each other and hence the reversal of the decree, but that, either being supported by the evidence, the other could properly be disregarded and the decree denying probate allowed to stand.

Same—Setting Aside Will—*Quantum* of Proof.
4. A will should not be set aside except upon substantial evidence tending to show that it was not in fact the will of the testator.

43 Mont.—23

Same—Sanity—Presumptions—Instructions.

5.    The presumption that all persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity, attaches not only in a criminal case in which the defense of insanity is interposed (Rev. Codes, sec. 8113), but generally to human conduct in the relations of life; hence the giving of an instruction to that effect in a will contest in which the sanity of the testator was called in question was not error.

Same—Presumptions—Intermittent Insanity.

6.    The presumption that a thing once proved to exist continues as long as is usual with things of that nature applies only to those conditions which from their nature must continue for some appreciable length of time; it, therefore, has no application to cases of intermittent or occasional insanity, but only to those of an habitual or permanent nature.

Same—Intermittent Insanity—Evidence—Immateriality.

7.    Where the evidence in a contest involving the probate of a will tended to show that testator had been suffering from intermittent or occasional insanity, the question at issue was whether he was of sound mind at the time he executed the instrument; if so, evidence of his mental condition preceding and subsequent to its execution was immaterial.

Same—Burden of Proof—Erroneous Instruction.

8.    In a will contest, the general burden being upon the contestant to establish by a preponderance of the evidence the facts upon which he relies to set the will aside, it was error to instruct the jury that the proponent was bound to show that, insanity in testator having been shown to exist at a time preceding as well as subsequent to its execution, it was executed at a time when he was of sound and disposing mind, else they should find for contestant.

Same.

9.    The evidence as to whether testator's sanity was general and habitual, or intermittent only, having been in direct conflict, the instruction referred to in paragraph 8 above was further erroneous as invading the province of the jury in that it in effect assumed that his mental condition was habitual, a question exclusively for their determination.

Same—Evidence—Hypothetical Questions—Contents.

10.    A hypothetical question reciting a fact not shown by the evidence is improper.

Same—Insanity—Depositions—Evidence—Inadmissibility.

11.    A deposition taken to be used in a guardianship proceeding was improperly admitted in evidence in a contest involving the question whether the incompetent for whom a guardian was appointed, and who subsequently died of dementia, was sane or insane at the time he executed the will sought to be probated; neither the parties nor the subject matter were the same, hence the evidence was inadmissible under section 8010, Revised Codes.

*Appeal from District Court, Lewis and Clark County; J. Miller Smith, Judge.*

CONTEST of will of Edward J. Murphy, deceased, by Mary Murphy against Anna E. Nett. Judgment for contestant, and contestee appeals. Reversed and remanded.

*Messrs. H. G. & S. H. McIntire* submitted a brief in behalf of Appellant.   *Mr. H. G. McIntire* argued the cause orally.

It is a matter of notoriety that attacks on testamentary dispositions have become alarmingly frequent; indeed, it may safely be said that in the lay mind the only excuse which is needed for such an attack is dissatisfaction on the part of a deceased person's heirs at law with the provisions of such a disposition; and seldom it is that a jury fails to respond favorably to the clamors of the disappointed or dissatisfied ones.   Hence it is that the courts have found it necessary to closely scrutinize the testimony in will contests and grant a new trial if the verdict returned is in utter disregard of the evidence.   (See *Schmidt* v. *Schmidt*, 201 Ill. 191, 66 N. E. 374; *Bradley* v. *Palmer*, 193 Ill. 15, 61 N. E. 856; *In re McDevitt's Estate*, 95 Cal. 17, 30 Pac. 106; *Rutherford* v. *Morris*, 77 Ill. 397; *Freeman* v. *Easly*, 117 Ill. 317, 7 N. E. 656; *Nieman* v. *Schnitker*, 181 Ill. 400, 55 N. E. 151.)   And this court is, apparently, in full accord with the views expressed in these cases.   (*In re Miller's Estate*, 37 Mont. 545, 97 Pac. 935; *In re Hobbin's Estate*, 41 Mont. 39, 108 Pac. 8.)

The *quantum* of proof essential to the validity of a verdict is prescribed by section 7856, Revised Codes.   This statute is identical with section 1835 of the California Code of Civil Procedure, under which it was held in *Gustafson* v. *Stockton etc. Co.*, 132 Cal. 619, 64 Pac. 995, that evidence which was slight and vague would not justify a verdict.   (See, also, *Brown* v. *Central etc. Co.*, 72 Cal. 527, 14 Pac. 138; *Carpenter* v. *Bailey*, 94 Cal. 406, 29 Pac. 1102 (a will contest); *Puckhaber* v. *Southern etc. Co.*, 132 Cal. 363, 64 Pac. 481; *Bagnall* v. *Roach*, 76 Cal. 106, 18 Pac. 137; *In re Dolbeer's Estate*, 149 Cal. 227, 86 Pac. 703.)

A new trial is properly granted in a proceeding to contest a will for errors of law which affected the verdict, but if the verdict has no support in the evidence, then the presumption of validity of the will attaches, and judgment must be entered accordingly.   (*Ginter* v. *Ginter*, 79 Kan. 721, 101 Pac. 634, 22

L. R. A., n. s., 1025; *In re Shell*, 28 Colo. 167, 89 Am. St. Rep. 181, 63 Pac. 413, 414, 53 L. R. A. 389)

No weight should or can be attached to the testimony of plaintiff's medical experts, Scanland and Riddell, because of the incomplete statement of the facts in the hypothetical question propounded to them on which it is predicated. It has been well said that an opinion can have no weight other than that which the reasons or grounds therefor bring to its support. (*In re Dolbeer's Estate, supra; Kinne* v. *Kinne,* 9 Conn. 102, 21 Am. Dec. 732; *Brashears* v. *Orme,* 93 Md. 442, 49 Atl. 620; *Prentis* v. *Bates,* 93 Mich. 234, 53 N. W. 153, 17 L. R. A. 494; *Wetherbee* v. *Wetherbee,* 38 Vt. 454; *Hitchcock* v. *Burgett,* 38 Mich. 501.) That little weight is properly attachable to so-called expert testimony of medical men, no matter what their standing may be, see *In re Dolbeer's Estate, supra; In re Phillip's Will,* 34 Misc. Rep. 442, 69 N. Y. Supp. 1011; *In re Kiedaich's Will,* 13 N. Y. Supp. 255. "The opinions of experts upon a question of testamentary capacity are entitled to but little weight as against proof of facts and circumstances which show mental and testamentary capacity." (*Burley* v. *McGough,* 115 Ill. 11, 3 N. E. 738; see, also, *Treat* v. *Bates,* 27 Mich. 390; *Kelly* v. *Perrault,* 5 Idaho, 221, 48 Pac. 45; *Johnston* v. *Turnbull,* 124 Fed. 476.) The testimony of an attorney who drew the will of testator and that of the physician who attended him at the time, when positive as to the testamentary capacity, is of far more weight than the opinion of medical experts, based on hypothetical questions. (*In re Kane's Estate,* 206 Pa. 204, 55 Atl. 917.)

To make a valid will it is not necessary that the testator should be endowed with an intellect measured up to the ordinary standard of mankind. (See *Keely* v. *Moore,* 196 U. S. 46, 25 Sup. Ct. 169, 49 L. Ed. 376; *Kingsbury* v. *Whitaker,* 32 La. Ann. 1055; *Scott* v. *Briscoe,* 36 La. Ann. 278.) "Impairment of mind and weakness of mind do not constitute the statutory unsoundness of mind which is required to invalidate a will." (*Leeper* v. *Taylor,* 47 Ala. 221; *McFadin* v. *Catron,* 138 Mo. 197,

38 S. W. 932, 39 S. W. 771; *McBride* v. *Sullivan*, 155 Ala. 166, 45 South. 902; *Southworth* v. *Southworth*, 173 Mo. 59, 73 S. W. 129; *In re Folts*, 71 Hun. 492, 24 N. Y. Supp. 1052.)

"In order to establish undue influence, proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, so as to destroy free agency in the testator." (*In re Murray's Estate*, 11 Pa. Co. Ct. Rep. 263; *Tawney* v. *Long*, 76 Pa. 106; *In re Pensyl's Estate*, 157 Pa. 465, 27 Atl. 669; *In re Logan's Estate*, 195 Pa. 282, 45 Atl. 729; *Herster* v. *Herster*, 122 Pa. 239, 9 Am. St. Rep. 95, 16 Atl. 342; *Pennypacker* v. *Pennypacker* (Pa.), 8 Atl. 634; *Trumbull* v. *Gibbons*, 22 N. J. L. 117.) "The influence of gratitude, affection or attachment, or the desire of gratifying the wishes of another, do not amount to undue influence." (*Jackson* v. *Hardin*, 83 Mo. 175; *McFadin* v. *Catron*, 138 Mo. 197, 38 S. W. 932, 39 S. W. 771; *Riley* v. *Sherwood*, 144 Mo. 366, 45 S. W. 1077; *Tibbe* v. *Kamp*, 154 Mo. 545, 54 S. W. 879, 55 S. W. 440; *Sehr* v. *Lindemann*, 153 Mo. 276, 54 S. W. 537; *Campbell* v. *Carlisle*, 162 Mo. 634, 63 S. W. 701; *Duffield* v. *Robeson*, 2 Harr. (Del.) 375; *In re Disbrow's Estate*, 58 Mich. 96, 24 N. W. 624; *Patterson* v. *Lamb*, 21 Tex. Civ. App. 512, 52 S. W. 98; *In re Halbert's Will*, 15 Misc. Rep. 308, 37 N. Y. Supp. 757; *In re Gleespin's Will*, 26 N. J. Eq. 523; *In re Elliott's Will*, 25 Ky. (2 J. J. Marsh.) 340.) "Confidential relations existing between testator and beneficiary do not alone furnish any presumption of undue influence." (*Mackall* v. *Mackall*, 135 U. S. 167, 10 Sup. Ct. 705, 34 L. Ed. 84.) "The law does not permit undue influence to be inferred from the mere fact that one who is to profit by the instrument had an opportunity to impress his will upon the mind of the testator. There must be some evidence tending to show that an undue influence was actually exerted." (*Smith's Exr.* v. *Smith*, 67 Vt. 443, 32 Atl. 255; *Riley* v. *Sherwood*, 144 Mo. 354, 366, 45 S. W. 1077; *McCulloch* v. *Campbell*, 49 Ark. 367, 5 S. W. 591; *Armstrong* v. *Armstrong*, 63 Wis. 162, 23 N. W. 407.) The influence which will invalidate a will must not only be

undue, but it must exist at the time of the making of the will, and must be a controlling influence in impelling the execution of the act itself. (*Nelson's Estate,* 132 Cal. 182, 64 Pac. 292, 298; *In re Calef's Estate,* 139 Cal. 673, 73 Pac. 539.)   In the late case of *Ginter* v. *Ginter, supra,* the whole subject of what constitutes undue influence is so exhaustively and lucidly gone into as to leave very little open for further discussion.

"If the testator was of sound mind at the time he executed his will, it is immaterial what the condition of his mind was either before or after that time." (Beach on Wills, sec. 98; see, also, *Bundy* v. *McKnight,* 48 Ind. 502; *Clark* v. *Ellis,* 9 Or. 128; *In re Carithers' Estate,* 156 Cal. 422, 105 Pac. 127; *In re Wilson's Estate,* 117 Cal. 276, 49 Pac. 176, 711.) "If it is shown that a testator was insane at any time prior to the making of the will, this fact will not support the presumption that the insanity continued down to the making of the will, unless it is shown that it was habitual and fixed." (*Murphree* v. *Senn,* 107 Ala. 424, 18 South. 264.)   Insanity which is not shown to be settled or general, as contradistinguished from a mere temporary aberration or hallucination, will not be presumed to continue until the contrary is shown. (*People* v. *Francis,* 38 Cal. 183; *Turner* v. *Rusk,* 53 Md. 65; *In re Nelson's Estate,* 132 Cal. 182, 64 Pac. 298.)   The burden of proof to show mental incompetence is on the contestant. (*In re Dolbeer's Estate, supra; Farleigh* v. *Kelley,* 28 Mont. 421, 72 Pac. 756, 63 L. R. A. 319.)

*Messrs. Galen & Mettler* submitted a brief in behalf of Respondent, and argued the cause orally.

"On a contest of a will on the ground of mental incapacity it was proper to instruct the jury that testamentary incapacity is an incapacity existing contemporaneously with the execution of the alleged will; that, the original presumption of sanity and capacity being always indulged, the burden of proving such incapacity is on contestants, and can only be shifted by showing prior insanity, or actual insanity, or other incapacity, at the date of the instrument." (*Eastis* v. *Montgomery,* 95 Ala. 486, 36 Am. St. Rep. 227, 11 South. 204.)   "When the validity of a

will is contested on the ground of the testator's mental inca-
pacity, the burden of proof is, in the first instance, on the con-
testant; but when lunacy has been once established, it then
devolves on the proponent to show that the will was executed
during a lucid interval, and he cannot again shift the *onus* by
proving merely that the testator 'had lucid intervals on the
morning of the day before' the execution of the will." (*Saxon*
v. *Whitaker's Exr.*, 30 Ala. 237.) "As sanity is always to be
presumed until the contrary be shown, so if insanity can be
proved at any time before making the will, it will be presumed
to have continued, unless the contrary be shown." (*Duffield* v.
*Morris' Exr.*, 2 Harr. (Del.) 375.) "If it be proved that a
testator, a short time before making his will, was of unsound
mind, it throws the burden of proof upon those who come to
support the will to show the restoration of his sanity." (*Halley*
v. *Webster*, 21 Me. 461.)

"In an action to set aside a will, if it is proved that there was
a general failure or derangement of the mental powers of the
testator for any considerable time, it will rest upon the party
supporting the will to show that such incapacity had ceased prior
to the making of the will." (*Clarke* v. *Fisher*, 1 Paige (N. Y.),
171, 19 Am. Dec. 402.) "Every man is presumed to have a
sound mind until the contrary be shown, and it is incumbent
on the party alleging insanity to establish the fact. If general
insanity be proved, it is presumed to continue until a recovery
be shown, and the party alleging a restoration to sanity must
prove his allegation. Insanity at the time of making a supposed
will must be shown." (*Grabill* v. *Barr*, 5 Pa. (5 Barr.) 441,
47 Am. Dec. 418.) "On the question of the validity of a will,
where there is uncontradicted evidence of general insanity at a
particular period, the *onus* of showing a lucid interval at the
very time of the subsequent execution of a will lies on the party
claiming under it. It is not sufficient that there is evidence of
sanity before and after the day on which the will is made; and
the jury cannot be permitted, from such evidence, to infer that
a lucid interval intervened during which the will was executed."
(*Harden* v. *Hays*, 9 Pa. (9 Barr.) 151.) "When once mental

incapacity is established, and a general derangement or imbecility of mind clearly proved at any time prior to the execution of the alleged will, the burden of proof is changed, and those seeking to establish the validity of the paper must show that at the time of its execution the alleged testator had sufficient mental capacity to execute a will, and that he had mind, memory, understanding and judgment, so that he could, in an intelligible way, dispose of his property." (*Landis* v. *Landis*, 1 Grant Cas. (Pa.) 248.) "Where a will is impeached on the ground of the insanity of the testator, it is incumbent upon those impeaching to show that the maker was not of sound mind at the date of the will; and for this purpose, proof of insanity, both before and after the date of the will, is admissible. Proof of insanity at those dates will throw the *onus* of proving sanity at the date of the will on those who support the will." (*Ford* v. *Ford*, 26 Tenn. (7 Humph.) 92.)

"Proof of the existence of confidential relations between testator and the legatee or devisee imposes upon proponent of the will the burden of showing by affirmative evidence the testator's capacity, volition and free agency." (*Daniel* v. *Hill*, 52 Ala. 430).

"The existence of a confidential relation, such as that of principal and agent, does not prevent one party from making a gift or legacy to the other, but only throws on the one claiming the gift or legacy the burden of showing that no undue influence was employed, or artifice or concealment practiced to obtain it." (*Decker* v. *Waterman*, 67 Barb. 460.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

On December 24, 1909, Anna E. Nett, defendant, filed a petition in the district court of Lewis and Clark county asking for an order admitting to probate a paper purporting to be the last will and testament of Edward J. Murphy, deceased, and to have been executed at Portland, Oregon, on December 12, 1908. The paper bears the signature of the deceased, attested by two wit-

nesses pursuant to the form prescribed by the statute. On January 8, 1910, Mary Murphy, plaintiff, the mother of the deceased, filed her written opposition to the probate, alleging, in substance: (1) That, at the time of the execution of the paper, Edward J. Murphy was insane and wholly lacking in mental capacity to make testamentary disposition of his property, and that the pretended will was not and is not his will; and (2) that the said instrument, if executed at all by the said Murphy, was procured to be executed by undue influence on the part of the defendant. Upon these allegations there was issue by answer. Upon a trial had to a jury, the following findings were returned:

"(1) Was the deceased, Edward J. Murphy, competent to make a last will and testament at the time of the signing of the instrument offered for probate as his will? Answer: No.

"(2) Was the mind of the deceased, Edward J. Murphy, at the time of the execution of the instrument offered for probate as his will, free from the undue influence of the defendant, Anna E. Nett? Answer: No."

The court entered its judgment thereon, rejecting the will and declaring that the deceased died intestate. The defendant has appealed from the judgment and an order denying her motion for a new trial. The principal contention is that the evidence is insufficient to justify the findings. Before proceeding to examine the evidence, however, we may properly notice briefly some suggestions made by counsel for appellant touching the sufficiency of the allegations of fact by plaintiff, showing undue influence, and alleged inconsistency in the findings.

It is suggested that the ultimate facts showing how undue influence was exerted upon the mind of the deceased are not alleged, and hence that this ground of plaintiff's opposition is vulnerable to a general demurrer. We understand that this suggestion carries with it the further suggestion that this ground of opposition is insufficient to sustain a judgment. We do not question the propriety of the rule invoked by counsel (*Estate of Gharky,* 57 Cal. 274; *In re Sheppard's Estate,* 149 Cal. 219, 85 Pac. 312); but we find nothing in the assignments of error

in the brief on this subject. Counsel are therefore not entitled to have the suggestion in this behalf considered. (*Hickey* v. *Kaufman*, 34 Mont. 106, 85 Pac. 870; *Delmoe* v. *Long*, 35 Mont. 139, 88 Pac. 778; *Lehane* v. *Butte Electric Co.*, 37 Mont. 564, 97 Pac. 1038; *Foster* v. *Winstanley*, 39 Mont. 314, 102 Pac. 574.) If it be conceded that this ground of opposition should be held insufficient as a pleading in point of law, yet, under the view we have taken of the case, the integrity of the judgment is in nowise affected. The allegation of want of testamentary capacity contained in the first ground of opposition is conceded to be, and is, sufficient to support the judgment, and no serious contention is made that the finding in response to the issue tendered thereon is not sufficient.

But counsel say that the two findings are inconsistent, in that the one negatives the existence of the fact found in the other, in other words, that the finding that the deceased executed the alleged will under the impulse of undue influence exerted by the defendant, implied testamentary capacity. A person enfeebled in mind and body, though still retaining testamentary capacity, may be more readily swayed and influenced by those about him, than when in his normal condition; yet, in a legal sense, undue [2] influence cannot be exerted upon a person who is so far insane or unconscious as to be destitute of testamentary capacity. (*Gwin* v. *Gwin*, 5 Idaho, 271, 48 Pac. 295; *Stirling* v. *Stirling*, 64 Md. 138, 21 Atl. 273; 29 Am. & Eng. Ency. of Law, 2d ed., 104.) When in this condition a person is without intelligent volition; he is for that reason not legally responsible for his acts, whether they are prompted by others or not. Undue influence imposes a restraint on the will of the testator, who, but for the restraint, would be free and responsible, so that his testamentary act is not the result of his own volition, but of the will of another. Therefore, the findings involve conclusions which cannot logically stand together, and in this sense are inconsistent; yet they are not inconsistent in the sense that each requires the [3] rendition of a different judgment and thus mutually destroy each other. This is the test by which must be determined

the question whether the judgment as rendered should be allowed to stand. The findings are not so intimately connected that error in the one implies error in the other. Hence, if either be supported by the evidence, and it does not appear that substantial error intervened affecting it, the other may be regarded as immaterial. (*Dexter* v. *Codman*, 148 Mass. 421, 19 N. E. 517.) In this case it was said: "It is a mistaken assumption that the issues as to sanity and undue influence, in a case of this kind, are necessarily so connected that error in a finding upon one of them implies error in the finding upon the other. In many cases, perhaps in most, they are very closely connected. In some the connection is slight and unimportant. Where there is a close connection, sometimes it is such that an error in relation to the former would almost certainly involve an error in regard to the latter, while an error in regard to the latter would not be likely to affect the finding upon the former. Sometimes a very important part of the evidence of undue influence is the mental condition of the testator, and sometimes the proof comes chiefly from overt acts of coercive tendency. In the same case there may be evidence tending to show insane delusions affecting the disposition which a testator seeks to make of his property, and evidence of undue influence which has hardly any relation to his mental peculiarity. How far the fact that a jury has gone astray in dealing with one issue shall be deemed important in considering a motion to set aside their findings upon another must depend upon the relations of these issues to each other in the particular case, the evidence introduced upon each, and any facts and circumstances which throw light upon the nature or probable cause of the jury's mistake. And finally, each issue is to be dealt with by itself, in view of the evidence, and of all that has occurred in the course of the proceedings."

The court should have directed the jury to omit an answer to the second interrogatory if they should answer the first in favor of the plaintiff, and *vice versa*. But that this course was not pursued does not necessarily require a reversal of the judgment, if either finding is justified by the evidence. Moreover, this

contention, like the one first noticed, is made by way of suggestion during the course of the argument upon the sufficiency of the evidence. It is technical in character, is not based upon any special assignment of error, nor is it pointed out wherein any prejudice was wrought by the course pursued at the trial.

As to the mental capacity of the deceased: It would be impossible within reasonable limits to set forth and analyze in detail the large volume of evidence introduced at the trial. We shall therefore state our conclusions upon it, particularizing those portions of it only which we think require special notice.

The deceased was at the time of his death thirty-seven years of age. His father had been addicted to the use of alcoholic, liquors prior to the birth of deceased, and was quarrelsome and abusive toward the plaintiff. Because of his abusive conduct on one occasion, when the deceased was about three years old, he was struck on the head with a stick of wood by a brother of the plaintiff. Subsequently he became insane and was confined in the asylum for the insane at Warm Springs, dying of dementia in 1907. The deceased was sober and industriously devoted himself to the business of stock-raising, with the result that at the time of his death he had accumulated a considerable estate. During the year 1907 the deceased began to show some eccentricities of conduct; but these are significant only when viewed in the light of subsequent events. They were not deemed significant at that time. In August, 1908, while engaged in stacking hay, he fell from the stack sustaining a severe injury to his head. Presently he apparently recovered. During the following October he, with others, accompanied a shipment of cattle, by way of Great Falls, to Chicago. Before reaching St. Paul he became violently insane. Put under the influence of narcotics after his arrival at St. Paul he became better and proceeded to Chicago. On the way he again became violent. Upon his arrival there he was put under treatment. The defendant, who had also gone to Chicago in the meantime, took charge of him and had him under restraint and treatment at different institutions in the city for some eight or ten days. Thereupon, his condition not improving, under the advice of physicians, she

took him to Portland, Oregon, about the end of October, being accompanied by her two sons, James Owens, a half-brother, and a trained nurse. During the greater part of the journey he was violent and had to be kept under restraint. He was kept in Portland in different institutions under treatment, most of the time at St. Vincent's Hospital, until March 3, 1909. At that time he was removed to a hospital in Spokane, Washington, suffering from dementia, where he remained until his death in November following. It is not controverted that for some time after he was first taken to Portland he was intermittently insane and at times not competent to attend to business. He was constantly under treatment by a physician at the hospital, and all of the time, including the months of November and December, was in charge of a nurse specially employed to attend him.

The foregoing is a summary of facts about which there is not, nor can there be, any controversy upon the evidence. Nor, do we think, is there any substantial ground for controversy that, up to about December 1, and after some time early in 1909, the deceased was not mentally competent to attend to business of any character. The testimony as to his condition after this time, and particularly on December 12, is conflicting. Charles Reed was an inmate of the hospital some time prior to and until December 12. He was employed as a nurse for deceased from November 25 until December 3. He testified: "When I first saw him [deceased], he was in an unconscious condition and in a strait-jacket lying in a cot on the floor. He was in a stupor or unconscious, and we took him that night to St. Vincent's Hospital. His condition from the 25th of November until the 3d of December, while I was attending him, was such that at times he was rational, and at other times he was unconscious, and other times he was strapped on the bed. He was in a strait-jacket several times; it was necessary to put him in a strait-jacket to keep him in bed. At times he would be delirious and moaning and others rational. I took an interest in him on account of him coming from Montana. I left the hospital on the 19th of December. Along about December 12, I would say he was in a kind of stupor and in an unconscious condition. He used to bump his head on

the floor. One night when I was nurse he got out of bed and bumped his head. He wouldn't say anything to anybody unless they would speak to him. * * * It was necessary to strap him to the bed because he was delirious and would not stay in unless he was strapped. * * * Along about the 12th of December Mr. Murphy seemed to be in a stupor. He would talk if you would talk with him; but, if you didn't talk with him, he would not say anything, but just lay there and gaze at you. I cannot say that he talked rationally at any time. His physical condition was pretty poor. He was between life and death at the time he was brought up to the Sisters' Hospital on November 25. At the time I found him he did not give evidence of having been cared for properly, because there was not the proper place to have the proper care. He was in a dirty condition. On or about the 5th of December he was rational at times, and there were other times that he was not; he was out of his mind entirely. He would be rational for an hour or two and then would sink down again.''

Two physicians residing in Montana, who did not know deceased, called to express opinions based upon the facts shown in the evidence, stated that in their opinion the deceased was suffering from dementia, an incurable form of insanity; that, being so afflicted, he was not subject to lucid intervals; and hence that he was incompetent at the time the will was executed. Both qualified their opinions as to his competency on December 12, by saying that they did not care to be understood as contradicting any statements made in this regard by the physician who attended the deceased, inasmuch as a physician who had made personal inspection and examination was better qualified to speak as to the actual condition.

Counsel for appellant insist that, notwithstanding this evidence, no other conclusion can be drawn from the evidence as a whole than that on December 12, when the will was executed, the deceased was passing through a lucid interval which covered at least three weeks of the month of December, and that he not only fully understood the nature of his act in executing his will, but that, also, by doing it he accomplished the purpose which he had

theretofore often expressed his intention to accomplish, *viz.*, to make the defendant his sole beneficiary, subject to the condition that his mother should be given support out of his estate during her lifetime. It is true that the evidence introduced by defendant tends to show that the deceased, after his manifestations of mental derangement at St. Paul and Chicago and during the month of December, experienced lucid intervals, and that during these times he was apparently in full possession of his senses. It tends to show that he conversed with his nurse and the attendant physician at different times about his business affairs and his intentions with reference to a disposition of his property. Dr. Story, the attending physician, testified: ''Edward Murphy was in my charge at Portland between November 27, 1908, and the last week of February, 1909, suffering from a deranged mental condition, not affecting his consciousness, but partly his mental understanding at times. His mind became rational and resumed its ordinary action some two or three weeks in December. He had lucid intervals lasting several days at a time, during which he seemed to be very much improved, and gradually improving under these conditions; that is, we hoped he would regain his faculties completely and permanently. * * * From the first week in December until toward Christmas, daily, when I saw him, he was rational and apparently improving. During this time he gave rational replies to all questions put to him by me. * * * I considered that at most of the time, from the first week of December until just before Christmas time, he was rational and able to intelligently direct his personal and business affairs. * * * Along the second week in December he wrote a letter to his mother, the composition of which was perfect and rational.'' Treatment was abandoned after the end of February because the condition of the deceased became hopeless.

The nurse, Anna Shannon, who was one of the attesting witnesses and who attended him from December 1 and for two weeks thereafter, stated that when she was employed he appeared to be at times mentally deranged, but during most of the time when she was with him he was rational; that his condition

constantly improved; and that, because he conversed with her
intelligently about his business and upon other subjects, she
was of the opinion that his mental condition was good. This
witness was not examined with reference to the condition of the
deceased on December 12. Her deposition had been taken in
April, 1909, to be used upon an application by defendant, then
pending in the district court of Lewis and Clark county, to have
herself appointed guardian of the deceased as an incapable and
insane person. It appeared at the hearing that defendant,
whose fitness to act as guardian was contested by the plaintiff,
had theretofore assumed control of the estate and business affairs
of the deceased under a power of attorney executed by him on
December 5, seven days before the execution of the will, and
the special purpose of the deposition was to show that at the
time of the execution of this instrument the deceased was men-
tally competent. Its office on that hearing was to show that
deceased, at a time when he was competent to act for himself,
had chosen defendant to act as his confidential agent, and hence
that she was a fit person to be appointed his guardian. Except
in her general statements as to the condition of the deceased
during the month of December, she did not testify at all as to
his condition at the date of the execution of the will. Nor was
she cross-examined with reference to it.

Patterson, the other attesting witness, was examined at length.
He had met the deceased, who had visited Portland in company
with the defendant in March and May, 1908. He seems to have
been an intimate acquaintance, the intimacy having been brought
about by the fact that, during the visit just mentioned, the de-
fendant and deceased had occupied a suite of rooms adjoining
those occupied by the witness. When the defendant took de-
ceased to Portland, the acquaintance was renewed, the defendant
having put her two sons into the school in which the witness was
a teacher. He testified in detail as to his observation of the
deceased on the occasion of the several visits paid him at the
hospital upon the invitation of defendant, from about November
25, 1908, until the latter part of the following January. During
the month of January he met the deceased while walking in

company with the defendant and conversed with him. He visited the deceased at the hospital four times prior to December 12. He did not know, nor did he inquire, why the deceased was confined in the hospital under the care of a physician and nurse, except that he was told by the defendant that he was there because of an injury received from a fall from a haystack. He stated definitely that on none of these visits or meetings did he observe any evidence of mental derangement of the deceased, but that he appeared just as intelligent as he was upon his visit to Portland in May, 1908, and conversed generally as intelligently as he did then. He detailed with much particularity the circumstances attending the execution of the will. There were present Anna Shannon, the nurse, and, besides himself, his wife and mother. The will, theretofore prepared—by whom the evidence does not disclose—was read aloud by him to the persons there present. Thereupon the deceased said, "I think I have done the proper thing," looking interrogatively at the witness. The witness having replied, "Mr. Murphy, I think you have," the deceased said, "I think so." The instrument was then executed and attested and handed to Miss Shannon by the deceased, for safekeeping. The testimony of two sons of the defendant who, though not present at the time of the execution of the will, saw their uncle frequently, was substantially to the same effect.

Mr. Cavanaugh, an attorney who prepared the power of attorney executed on December 5, testified, in effect, that at the time he questioned the deceased particularly in order to ascertain whether he fully understood the nature of his act, and became satisfied that he did, or otherwise he would not have permitted the execution of the instrument.

There is not any evidence in the record showing that the deceased ever, after his attack at Chicago, attempted to transact business of any kind, other than to execute the power of attorney and the will.

The theory of counsel for defendant is that the burden of showing that at the time the will was executed the deceased was not competent was upon the plaintiff; that the evidence intro-

43 Mont.—24

duced by her is not sufficiently substantial in character to produce moral certainty in an unprejudiced mind—in other words, is only slight evidence—and hence that the findings of the jury must have been in favor of the defendant. We concede that the evidence is not as satisfactory as it might be. We agree that the right to make disposition of one's property by will is a right guaranteed by law, and is as valuable as any other property right; that the beneficiaries under a will are entitled to protection just as are other property owners; that jurors are often inclined to disregard the evidence and to set aside a will upon some excuse found outside of the evidence, because the dispositions made by the testator do not comport with their personal [4] notions of what is just and proper; and that in all such cases it is incumbent upon the court not to permit a will to be set aside except upon substantial evidence tending to show that it is not in fact the will of the testator. (*In re Noyes' Estate,* 40 Mont. 178, 105 Pac. 1013; *Schmidt* v. *Schmidt,* 201 Ill. 191, 66 N. E. 374; *In re McDevitt's Estate,* 95 Cal. 17, 30 Pac. 101.) Yet, as pointed out by this court in *Re Noyes' Estate, supra,* in a will contest the finding of the trial judge or jury, as the case may be, cannot be disturbed on appeal if there is any substantial evidence to support it. As in any other case, substantial evidence tending to show lack of testamentary capacity, or any other fact invalidating a will, is sufficient to go to the jury, though it be controverted by countervailing evidence. The evidence in this case, the salient points of which have been set forth above, makes such a case.

It is not controverted that the deceased became insane during the month of October, and remained so intermittently during the month of November. There is some direct evidence—that of the witness Reed—that he remained in this condition well into December, and that he was in an apparent stupor and in an unconscious condition on or about December 12. Two physicians were of the opinion that he was suffering from an incurable insanity and not subject to lucid intervals. It is not controverted that in the early part of the year 1909 he became permanently insane from dementia and remained so until his death. During

all the time he was in a hospital in charge of a nurse and under treatment for mental derangement. His somewhat extensive property was apparently left to the control of others. Counsel say that the evidence of the witness Reed should be entirely disregarded, because he not only exhibited personal interest in the case by his manifest hostility toward defendant, but confessed that he is an ex-convict, having served a term in the state prison for larceny. It is said, also, that the testimony of the two local physicians is not entitled to any weight because they had not made personal examination of the deceased, and because expert testimony is at best not worthy of much credit.

The testimony of Reed and that of the physicians aside, they insist that the testimony of Dr. Story and that of the witness Patterson is uncontradicted and should have been deemed conclusive. The testimony of these witnesses, however, was competent. The weight to be given it was for the jury to determine; so, also, in the light of all the attendant circumstances, the credibility of the testimony of Dr. Story and the witness Patterson was for the jury to determine. The question as to who should sustain the burden of proof we shall consider when we come to examine the instructions submitted to the jury.

Upon the issue of undue influence, a great deal of evidence other than that summarized above was introduced. We shall not undertake a discussion of it. We are satisfied, however, that, taking into consideration the intimate confidential relations shown to have existed between the defendant and the deceased, the weak mental condition of the latter, assuming that he was mentally competent notwithstanding his condition, together with all the other circumstances, a case was made sufficient to go to the jury within the definition of "undue influence," as declared by the statute. (Rev. Codes, sec. 4981.) Upon another trial, which we must order because of error in the instructions, the trial court should bear in mind that undue influence cannot, in a legal sense, be exerted upon a person who is destitute of testamentary capacity, and submit the findings to the jury with explicit directions, in accordance with the suggestions heretofore made.

Complaint is made that the court erred in submitting the following instructions:

"(4) The court instructs you that all persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity."

"(6) The court instructs you that where insanity in the testator has been shown to exist at a time previous to the execution of the will, and is also shown to exist at a time subsequent to the execution of the will, the proponent of the will is then bound to show that it was executed at a time when the testator was of sound and disposing mind."

The criticism of instruction 4 is that it states the test by which ability to form a criminal intent is to be determined, and is therefore inapplicable to a case such as this, involving an inquiry as to mental capacity of an alleged testator, because it takes less mental capacity to make a will than it does to form a criminal intent. The instruction is taken from section 8113, Revised Codes. It states the presumption which prevails at the outset in every criminal case: That the defendant is sane until the contrary appears. As counsel say, it has no reference to the extent of mental capacity necessary to enable one to enter into a valid [5] contract or make a will. Neither has it reference to the extent of mental capacity required for any other purpose. It states only the presumption which attaches generally to human conduct in the relations of life. There was therefore no error in giving it, although, perhaps, in the form in which it is stated, its meaning was not apprehended by the jury.

Instruction No. 6 is clearly erroneous. In effect it told the jury to find for the plaintiff if the evidence showed that the deceased was insane at any time prior to December 12, and at any subsequent time, unless the defendant had sustained the burden of showing by preponderating evidence that he was sane, and therefore competent at the time he executed the will. The burden of proof was thus cast upon the defendant.

Evidently the court had in mind the presumption mentioned in section 7962, subdivision 32, Revised Codes: "That a thing once proved to exist continues as long as is usual with things of

that nature." This presumption does not apply regardless of the nature of the thing or condition in question. It applies [6] only to those conditions which from their nature must continue for some appreciable length of time. (*Scott* v. *Wood,* 81 Cal. 398, 22 Pac. 871.)

Lunacy, or insanity, if of a general, habitual, or permanent nature, once shown to exist, is presumed to continue until the presumption is overturned by countervailing evidence. This rule is recognized by the courts generally. (*In re Brown,* 39 Wash. 160, 109 Am. St. Rep. 868, 81 Pac. 552, 1 L. R. A., n. s., 540, 4 Am. & Eng. Ann. Cas. 488, and notes; 16 Am. & Eng. Ency. of Law, 2d ed., 604.) Where its existence is made to appear, the presumption referred to attaches; for we know from experience [7] that the condition usually continues. But to cases of intermittent or occasional insanity it can have no application, because in the very nature of things the idea of continuity is excluded. So that, when this is the condition, proof of its existence at one time raises no presumption that it existed either at an antecedent or subsequent time. The question for determination is: Was the testator of sound mind at the time the will was executed? If he was, his precedent and subsequent condition is immaterial. (See cases cited in note to *In re Brown, supra;* Beach on Wills, sec. 98; *Bundy* v. *McKnight,* 48 Ind. 502; *People* v. *Francis,* 38 Cal. 183; *Heirs of Clark* v. *Ellis,* 9 Or. 128; *In re Carithers,* 156 Cal. 422, 105 Pac. 127; *Murphree* v. *Senn,* 107 Ala. 424, 18 South. 264; *Turner* v. *Rusk,* 53 Md. 65; *In re Nelson's Estate,* 132 Cal. 182, 64 Pac. 294.) The most that can be said of the evidence in this case is that it presented a controversy as to whether prior to December 12 the insanity of the deceased was general and habitual, or whether it was intermittent only.

Under the statute the contestant occupies the position of plaintiff. (Rev. Codes, sec. 7397.) He has the affirmative of the issue and must prove it or be defeated. (Section 7972.) The procedure to be observed in this class of cases is pointed out in *Farleigh* v. *Kelley,* 28 Mont. 421, 72 Pac. 756, 63 L. R. A. 319. The trial is initiated when the formal preliminary proof of the execution of the will is before the court; that is, formal proof

that the testator was of sound and disposing mind, and that the formalities required by the statute were observed. Proof of these facts having been made, the order admitting the will to probate follows as a matter of course, but for the contest. There-[8] upon the general burden is upon the contestant throughout to establish, by a preponderance of the evidence, the facts upon which he relies to have it set aside. Of course, when he has made out a *prima facie* case, the burden is cast upon the proponent to furnish rebutting proof, but he is not required to do more than this; and, if in the end the contestant has not sustained the burden, his contest must fail. (*Estate of Dolbeer,* 149 Cal. 227, 86 Pac. 695.) The instruction, given as it was, without qualification, in effect assumed that the mental condition [9] of the deceased prior to December 12 was general and habitual; whereas, the evidence was in direct conflict. It thus invaded the province of the jury. Again, in instruction 12 the court correctly declared the rule which the jury should observe in reaching their verdict, telling them that the burden was upon the contestant throughout. Instruction No. 6 is in direct conflict with this. For these errors the defendant is entitled to a new trial.

Errors are alleged upon the giving of other instructions and a refusal to give one requested by the defendant. But what has already been said fully disposes of the contentions made in respect of them. The errors alleged upon the admission and exclusion of evidence are not of sufficient merit to demand special notice.

The hypothetical question submitted to Dr. Scanland recited one fact not shown by the evidence; but this was not of material import. For this reason the question is subject to criticism, [10] but otherwise it comes within the recognized rule. (*State v. Peel,* 23 Mont. 358, 75 Am. St. Rep. 529, 59 Pac. 169; *Carman* v. *Montana C. Ry. Co.,* 32 Mont. 137, 79 Pac. 690.)

The plaintiff has submitted under the provisions of the statute (Rev. Codes, sec. 7118) the ruling of the court in admitting [11] over her objection the deposition of Anna Shannon, heretofore referred to, and those of other witnesses taken to be used

in the guardianship proceedings in April, 1909. They were admitted upon the assumption that this controversy is one between the same parties and involving the same subject matter. This was error. The statute provides: "When a deposition has been once taken, it may be read by either party in any stage of the same action or proceeding, or in any other action between the same parties upon the same subject, and is then deemed the evidence of the party reading it." (Rev. Codes, sec. 8010.) The questions involved upon that application were whether the deceased was insane at that time, and whether the defendant was a suitable person to act as his guardian. There was no controversy upon the question of insanity. The several witnesses were neither examined nor cross-examined as to the mental condition of the deceased at the time the will was executed. Upon such an application the adversary parties are the petitioner and the alleged incompetent. (Rev. Codes, sec. 7764.) In this case the parties are not the same, nor is the subject matter the same. Depositions of witnesses, whether residing within or without the state, must have been taken upon the issue on trial, in the manner provided by the statute, upon notice to the adversary party and full opportunity accorded for cross-examination. Otherwise, as to him, they are merely *ex parte* affidavits and are not admissible against him.

The infirmity attaching to these depositions is that they were not taken to sustain any issue in this case; nor was there the opportunity for cross-examination which the law contemplates. They were not admissible from any point of view, even though the plaintiff did contest the fitness of the defendant to be appointed the guardian of her brother. The statute (Rev. Codes, sec. 7118, *supra*) requires this court to review the errors made, not only against the appellant, but also those made in his favor, if they are made to appear in the record by bill of exceptions, and prohibits the reversal of the judgment upon any error complained of by the appellant, if, but for the error against the respondent, the result of the trial would have been the same. As we have seen, a new trial of this case must be ordered for error which the error in the ruling in question cannot compensate.

We have deemed it necessary to state our conclusion with reference to it in order to prevent a repetition of it upon the next trial.

In the trial of this case the procedure outlined in *Farleigh* v. *Kelley, supra,* was entirely overlooked. Upon another trial the court should observe it and thus avoid much of the confusion which attended the former trial.

The judgment and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.

Rehearing denied June 22, 1911.