In the Matter of the Estate of GEORGE MARICICH. TED KUBERICH, Petitioner for Probate of Will and NICKOLA MARICICH, of District of Gospic, Peoples Republic of Yugoslavia, and Serbian Church Home, Anaconda, Montana, and Serbian Hercegovinian Unity Lodge of Anaconda, Montana, Contestants and Respondents; v. JERRY POPOVICH, Executor of the Last Will and Testament of GEORGE MARICICH, deceased, and MILAN BORYAN, Devisee and Legatee, Proponents and Appellants.

No. 10607.
Submitted May 12, 1964. Decided February 24, 1965.
Rehearing denied April 28, 1965.
400 P.2d 873.

Emmet T. Walsh and Jack Scanlon, Anaconda, Louis Forsell (argued), Helena, Urban Roth (argued), Butte, for appellants.

Robert J. Boyd (argued), Anaconda, William R. Taylor (argued), Deer Lodge, John N. Radonich (argued), Anaconda, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment of the third judicial district for Deer Lodge County, the Honorable John McClernan, Judge presiding, revoking an order admitting a will to probate.

The respondent contestant attacked the will on two grounds, lack of testamentary capacity and undue influence in the making of the will. The jury found by special verdict that:

1. George Maricich was mentally competent to make a last will and testament on May 16, 1960.

2. That the mind of George Maricich was NOT free from undue influence, menace or duress at the time of the execution of the instrument dated May 16, 1960.

The jury having found that George Maricich had the required mental capacity to make a will, the one and only question before this court is does the evidence show that the jury was correct in its findings that there was undue influence, menace or duress at the time of the making of the will.

George Maricich, the testator, was born in Yugoslavia and came to the United States as a young man. He never married. He apparently lived with a brother, Mane Maricich, and worked in the smelter in Anaconda until his brother's death in 1956. Soon thereafter, he moved into a rooming house where he lived until a few months before his death at Galen, the State Tuberculosis Hospital. Both Mane and George Maricich were hard-working frugal men, and during their lifetimes accumulated estates from their wages and savings.

When Mane Maricich died in 1956, George Maricich served as the administrator of his brother's will and was its beneficiary, he obtained the services of Irving C. Pearson, the county attorney, to probate the will of his brother. During the

course of the probate he had Mr. Pearson make a will for him. This will, hereinafter will be referred to as the 1956 will, and Ted Kuburich, a long-time friend and President of the Serbian Hercegovinian Unity Lodge of Anaconda, Montana, was named trustee and executor. The 1956 will provided that there be a nice green lawn at the Serbian Church, and directed Kuburich to dispose of the remaining property in accordance with the directions left by Maricich with the Serbian Hercegovinian Lodge. It is the contention of the proponents of this 1956 will (the contestants here) that the directions were to the Lodge that the testator's nephew in Yugoslavia was to receive his property, and this nephew Nickola Maricich is a contestant to the second will, the May 6, 1960, will. The testimony concerning this Yugoslavian nephew is that he is the only remaining relative; that he wrote to his uncle at Galen after learning from Mr. Kuburich that his uncle was seriously ill urging him "that in view of his illness that it would be best if the Hercegovinian Lodge took care of things for you so no one having no right to your holdings would claim such. Much better that you leave it to a blood relative and I am your nearest relative."

Some three years passed following the events of 1956 during which time George Maricich retired from the Smelter, and began living on the Smelter retirement plan and Social Security. He moved into a rooming house owned by a Mrs. Kosanovich and he continued to eat most of his meals in a restaurant owned by a Mr. and Mrs. William Lankeit. Both his landlady and the Lankeits testified at length at the trial concerning the kind of man the testator was and about the events that occurred after he became sick. Everyone spoke of him as a quiet, elderly man who spoke broken English. He understood the language of his adopted country but did not read or write it very well. He did speak, read and write the Serbian language. He regularly attended the Serbian Church and was a faithful member of the Serbian Lodge. Most of his friends were from these associations.

In late 1959, Mr. Maricich became seriously ill at his room and his landlady called upon the Lankeits, the restaurant owners, to take him to the local hospital. He gave Mrs. Lankeit's name to the hospital as a friend and the one "to be notified in case of emergency."

Some days later, when it was necessary to take Mr. Maricich to Galen, again it was the Lankeits who transported him, and again it was the Lankeits who were given as the friend to be notified in case of emergency. He was admitted to the State Tuberculosis Hospital at Galen on December 21, 1959. For the next two months the Lankeits looked after getting his mail to him, picking up his pension checks and doing for him the errands he desired done while hospitalized. Mr. Maricich had Mr. Walsh, who Mr. Lankeit thought was Mr. Maricich's attorney at the time he took him to the hospital, draw a power of attorney for Mr. Lankeit so that he could deposit the checks, pay his room rent, etc. Due to the fact the Lankeits were going to take a trip, and because they desired to get Mr. Maricich's business affairs in order, Mr. Lankeit petitioned the court on March 10, 1960, for letters of guardianship of the personal affairs of George Maricich. This petition for letters was dismissed by an order of the court April 13, 1960, on motion of Mr. Lankeit. The order and petition were prepared by Mr. Walsh. Mr. Lankeit testified that his reasons for dismissing his petition was that Mr. Pearson and Mr. Kuburich had gone to Galen and had gotten Mr. Maricich to sign papers on February 24, 1960, to appoint Mr. Kuburich his guardian. The information was given Mr. Lankeit some time in March, after he had filed his petition and during a visit with Mr. Maricich, and concerning the visit Mr. Lankeit testified that the following took place:

"Mr. Maricich was very upset, and he didn't know what to do, and he was apologizing and everything, and then he said something about—well, he wanted to know if I knew Mickey Boryan, and I told him that I did know Mr. Boryan, so he

wanted me to send Mickey Boryan down there, so I said, 'Well I don't see Mickey Boryan very often,' so then he said for me to go and see Emmet, and then have Emmet get ahold of Mickey Boryan, and bring him down, or send him down, and he said: 'He talks my language,' he said, 'so I want to see Mickey,' and so that was it, and I came back to Anaconda and notified Mr. Walsh about what had happened, and so then I was out of the picture as far as this was concerned." This conversation was the reason for Mr. Lankeit's withdrawal in April 1960.

The court records show the following concerning Mr. Maricich's affairs:

February 24, 1960—Petition for Appointment of Guardian filed by Theodore Kuburich;

March 10, 1960—Petition for Appointment of Guardian filed by William Lankeit;

March 22, 1960—A nomination of Ted Kuburich, signed by George Maricich.

March 23, 1960—Affidavit of disqualification filed by Theodore Kuburich, disqualifying Judge Stewart. An affidavit of disqualification filed March 23, 1960, and an affidavit filed and dated March 22, 1960, was signed by George Maricich, advising that he did not nominate or desire William Lankeit to be his guardian.

March 25, 1960—George Maricich filed his Waiver of Notice and Nomination for appointment on the 25th of March, 1960, as to Milan Boryan, declaring therein that Milan Boryan was his godson.

March 31, 1960—Petition for Letters of Guardianship by Milan Boryan, dated March 25, 1960, and filed March 31, 1960.

April 1, 1960—George Maricich filed an appointment of Milan Boryan.

April 27, 1960—Judge Victor Fall signed an order appointing Milan Boryan guardian.

The contestants allege the reason Mr. Kuburich was not

granted letters of guardianship was because Mr. Walsh, Mr. Boryan and Mr. Popovich made Mr. Maricich believe that because of the wording of the petition for guardianship that an effort was being made by Mr. Kuburich and Mr. Pearson to put him in the hospital for the insane.

One thing is certain from the testimony of all parties and that is, little interest was shown for Mr. Maricich for several months except by the Lankeits. It would appear that the discovery of a bank account of over $6,000 precipitated considerable interest in his welfare. Testimony of professional people at the Galen hospital indicates that because of the fact Mr. Pearson and Mr. Kuburich bothered him by their visits that he asked that they no longer be allowed to visit him in the hospital. Too, Mr. Lankeit testified that Mr. Boryan did not get into the picture until requested to do so by Mr. Maricich.

The contested will, hereinafter referred to as the second will, was witnessed and signed in Mr. Maricich's hospital room on May 16, 1960. It was agreed and testified to by nearly all parties during the trial that during April and May, George Maricich was mentally alert and in full possession of his faculties. Medical records of the hospital introduced at the time of trial, confirm the testimony of the various witnesses on these points.

Mr. Michael Papich, a school teacher in Anaconda and a lifelong friend of George Maricich, was a witness to the will. According to his testimony he had met Jerry Popovich, the named executor of the second will, several days before May 16th and that Popovich had told him that Mr. Maricich wanted him to come down to Galen to sign some papers for him. Mr. Papich is an accomplished linguist. He speaks, reads and writes the Serbo-Croatian language. As a result of this request he went to Galen after school on the 16th day of May to witness the will.

The other witness to the will was Dr. John C. Murphy, M. D., one of the medical staff at the State hospital. Prior to May 16,

1960, Dr. Murphy had attended the testator almost daily. He testified that Mr. Maricich was an alert, cooperative and mentally competent individual.

The jury heard no testimony on duress, undue influence or fraud from the witnesses to the actual making and signing of this will.

The contestants' case was directed to the period of time, February, March and April, when the contestants were involved in their attempts to get Letters of Guardianship. In fact the record is bare of any visits of either Mr. Pearson, or Mr. Kuburich after April, when they had been informed by hospital authorities that Mr. Maricich did not want them to visit him. The stress of the contestants' case was to the events of over a month prior to the signing of the will. Only one fact, brought out by the contestants during cross examination, raised any question concerning the signing of the will and that was the payment to each of the witnesses, Michael Papich and Dr. J. C. Murphy of a $100 witness fee. While this is a most unusual fee the statement made by Mr. Papich was that it was both a surprise and so unusual that he called Mr. Walsh to ask what it was for. The testimony of Dr. Murphy was that he was paid $100 as a witness at the guardianship hearing as well as $100 for his signing the will.

Michael Boryan, the contestant, in an attempt to show his activities concerning the guardianship and execution of the will, brought forth the following facts for the jury's consideration. From Ted Kuburich the testimony that Boryan and Popovich had interfered with his lifelong friendship with Maricich and had changed his mind about making Kuburich his guardian by letting Maricich believe that Kuburich was attempting to put him in the hospital for the insane. Too, the testimony of Mr. Maricich's landlady that Boryan had made numerous efforts to get into Mr. Maricich's room prior to getting letters of guardianship, and on one occasion Boryan told her she could have all that was in the room if she would give

him one suitcase. She said that she resisted all of these efforts until early in May when Mr. Maricich was brought into Anaconda by Boryan, and this was after Boryan had been made guardian, at which time she was told by Mr. Maricich to let Mr. Boryan have the contents of the room. She testified that she had been threatened with a criminal charge on March 31 by Boryan if she did not let him into the room.

The testimony showed that in May Maricich gave up his room in Anaconda, and that on the occasion he was brought to town to tell his landlady to let Boryan into the room that he took back to the hospital a footlocker which from that time on until his death he kept close check on. There is no evidence that the locker was ever opened by anyone prior to his death nor is there any evidence that its contents were known. On the evening of his death the hospital authorities in checking his personal possessions found $13,671.59 in the footlocker mostly in $50, $20, and $10 bills. An accounting was made and the money turned over to Mr. Longfellow the coroner and undertaker. Mr. Longfellow put the money in the bank and testified that when he told Boryan about the money that Boryan "was very much surprised to learn of the amount left."

In addition, concerning Boryan's activities prior to Mr. Maricich's death it was brought out that attempts were made by him to change the beneficiary of George Maricich's life insurance policy with the S. H. Sloga Lodge and the policy with the Anaconda Company.

While these acts of Mr. Boryan may not necessarily have been inconsistent with good conscience, this considered along with the fact that Jerry Popovich, a man who could not read or write the English language, being named executor of the second will, and the fact there was no close friendship between Popovich and Maricich were certainly factors that must have been controlling when the jury decided as it did that the mind of George Maricich was *not* free from undue influence, menace or fraud.

While not made a specification of error, we cannot but note that the making of an uneducated person, one unable to read or write, the executor of an estate, is a questionable practice, the result of which, as in this case, raises inferences. Our statute on the qualifications of an executor is stated in sections 91-1301, 91-1302, R.C.M.1947, as follows:

"91-1301. *To whom letters on proved will to issue.* The court or judge admitting a will to probate, after the same is proved and allowed, must issue letters thereon to the persons named therein as executors, *who are competent to discharge the trust, who must appear and qualify, unless objection is made, as provided in section 91-1303.*"

"91-1302. *Who are incompetent as executors or administrators—letters with will annexed to issue, when.* No person is competent to serve as executor who, at the time the will is admitted to probate, is:

"1. Under the age of majority;

"2. Convicted of an infamous crime;

"3. Adjudged by the court or judge incompetent to execute the duties of the trust by reason of drunkenness, improvidence, or *want of understanding* or integrity.

"If the sole executor or all the executors are incompetent, or renounce, or fail to apply for letters, or to appear and qualify, letters of administration, with the will annexed, must be issued as designated and provided for the grant of letters in cases of intestacy." (Emphasis supplied.)

The second will, the one contested, named Milan Boryan as the closest living person to George Maricich and therefore the natural object of his bounty. He gave and bequeathed to Milan Boryan all of his property in his own right, and in case Milan Boryan predeceased him he left this property to Barbara J. Boryan, the wife of Milan. Considerable testimony was introduced by the contestants and proponents concerning what is known in old Croatian and Serbian families as the "Kum or Kumstvo" relationship. It is comparable to what is known in

156

the Catholic and Protestant faiths as the Godfather and Godson relationship except, according to some testimony in the Serbian religion, it had a broader meaning than in other religions. The proponents of the will alleged that a "Kum" relationship existed between Boryan and Maricich due to the fact that George Maricich's brother Mannie was Kum to Boryan's brother, and that in this case it existed between the whole Boryan family and the Maricichs. The contestants' testimony was to the effect that the "Kum" relationship was not so broad as to include Milan Boryan and that in succeeding generations the import of this relationship was being dissipated in the Serbian families.

While fourteen specifications of error are assigned by the appellants, we are of the opinion that such specifications of error resolve themselves to an inquiry on:

(1) Whether the verdict is contrary to the law and the evidence; and

(2) Did the court err in not granting appellant's motion for a new trial.

This court has gone to some length in setting forth the facts as brought out in the trial of this matter in the district court, and we will not further allude to them except insofar as they pertain to the law as set forth in the statutes and cases in Montana.

Montana has but two statutes pertaining directly to undue influence, section 91-103, R.C.M.1947, and section 13-311, R.C.M. 1947, which provide:

"91-103. *Will, or part thereof, procured by fraud.* A will, or a part of a will, procured to be made by duress, menace, fraud, or undue influence, may be denied probate; and a revocation, procured by the same means, may be declared void."

"13-311. *Undue influence—in what it consists.* Undue influence consists:

"1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of

such confidence or authority for the purpose of obtaining an unfair advantage over him;

"2. In taking an unfair advantage of another's weakness of mind; or,

"3. In taking a grossly oppressive and unfair advantage of another's necessities or distress."

Of necessity these statutes are quite broad. The scope and application of them has been considered and explained in the Montana case law, and it is felt, in viewing this evidence, that reference to Montana cases, rather than to out of state cases, are sufficient to decide whether or not there is sufficient proof of undue influence in the will. The law of the following cases are relevant and controlling in deciding this question: In re Williams' Estate, 52 Mont. 192, 156 P. 1087; In re Murphy's Estate, 43 Mont. 353, 116 P. 1004; Murphy v. Nett, 47 Mont. 38, 130 P. 451; Hale v. Smith, 73 Mont. 481, 237 P. 214; In re Bright's Estate, 89 Mont. 394, 300 P. 229; In re Choiniere's Estate, 117 Mont. 65, 156 P.2d 635; In re Cocanougher's Estate, 141 Mont. 16, 375 P.2d 1009.

In In re Murphy's Estate, 43 Mont. 353, 370, 116 P. 1004, this court held that the burden of proof is always on the contestant and if he fails in the burden, then the proponent must be a prevailing party. In deciding when a will must be set aside the court said, at page 370, 116 P. at page 1008, the following:

"* * * We concede that the evidence is not as satisfactory as it might be. We agree that the right to make disposition of one's property by will is a right guaranteed by law and is as valuable as any other property right; that the beneficiaries under a will are entitled to protection just as are other property owners; that jurors are often inclined to disregard the evidence and to set aside a will upon some excuse found outside of the evidence, because the dispositions made by the testator do not comport with their personal notions of what is just and proper; and that in all such cases it is incumbent

upon the court not to permit a will to be set aside except upon substantial evidence tending to show that it is not in fact the will of the testator."

The court then went on to say that even though this is so the jury verdict cannot be disturbed on appeal if there is any *substantial* evidence to support it. The court said that substantial evidence tending to show a lack of testamentary capacity, or any other facts invalidating a will, is sufficient to go to a jury, though it be controverted by contravening evidence. The court further said that the evidence in the case made such a case, for there the deceased became insane during the month of October sometime prior to the making of the will or at least the exact time of the execution of the will was a serious question. There is no question that in the early part of the year in that case that the testator had became permanently insane and remained so until his death.

Concerning the issue of undue influence the court, in the Murphy case, supra, 43 Mont. at 371, 116 P. at 1009, said: "We are satisfied, however, that, taking into consideration the intimate confidential relations shown to have existed between the defendant and the deceased, the weak mental condition of the latter, assuming that he was mentally competent notwithstanding his condition, together with all the other circumstances a case was made sufficient to go to the jury within the definition of 'undue influence,' as declared by the statute."

The next important case concerning undue influence is Hale v. Smith, 73 Mont. 481, 237 P. 214, supra. There Robert Hale, a strong-willed individual of advancing years, left a will which devised the larger part of his property to his housekeeper and left his collateral heirs very little. In a contest on the basis of "undue influence," the court held that in order for a will to be nullified by undue influence, there must be a showing that such influence amounted to coercion which destroyed the free agency of the testator at the time of the execution of his will. The mere showing of an opportunity to coerce is not

enough. Influencing a testator will not invalidate a will, and it is only when such influence is duly exerted over the very act of devising so as to prevent the will from being truly the act of the testator, will the will be condemned and held to be invalid.

In the case of Murphy v. Nett, 47 Mont. 38, 51, 130 P. 451, supra, the testator left one heir at law, a mother, one sister, the appellant, and several half-brothers and sisters. The terms of the will were to leave most to the appellant on the condition that she should, out of the property, support and care for the respondent, during the remainder of respondent's life. There the jury found no undue influence, however the court considered the pleadings of undue influence as a basis for introducing certain evidence. The court recognized that undue influence may be defined to be such as "imposes a restraint on the will of the testator, who, but for the restraint, would be free and responsible, so that his testamentary act is not the result of his own volition, but the will of another."

The court went on to say that the theory underlying the doctrine of undue influence is that the testator is induced, by the means employed, to execute an instrument in form and appearance his will, but in reality expressing testamentary dispositions which he would not have voluntarily made, and that to defeat a will, the undue influence must have been directed toward the particular testamentary act and at the time thereof, or so near thereto as to be operative. There the facts indicated that the appellant took very careful care of the testator, that he greatly depended upon her and did practically whatever she said. The court said that demands and importunities usually cannot alone support the charge of undue influence. The court noted however, that circumstances must be considered. In a case involving undue influence the question is not what effect the supposed influence would have upon an ordinarily strong intelligent person, but its effect upon the person on whom it was exerted, taking into consideration the time, place, and all the surrounding circumstances.

One of the strong cases on undue influence is In re Williams' Estate, 52 Mont. 192, 201, 156 P. 1087, 1089, supra, wherein a grandmother cut off her only blood relative, a granddaughter of whom she was very fond, and gave her money to a millionaire banker, not in any wise related to her by ties of blood, marriage, or even intimate relationship. The court said: "Upon the record we say that the will undertook to make a most unnatural disposition of the property, and evidence of such fact is always admissible as a circumstance to be considered with other evidence, as tending to show an unbalanced mind or a mind easily susceptible to undue influence." While the Williams case was tried to a judge without a jury it was a case, as in this case, wherein a motion for a new trial had been made and denied.

In the case of In re Bright's Estate, 89 Mont. 394, 300 P. 229, supra, this court found that one who was influenced in the disposition of her property by love and affection and gratitude for services well-performed was not such influence as comes within the rule with respect to undue influence.

Last but not least, is the most recent pronouncement of this court enunciating the law of undue influence in the case Estate of Cocanougher, 141 Mont. 16, 375 P.2d 1009, supra, similar to this case, in that capacity and undue influence were involved. The jury found in favor of the proponents on the question of capacity and so only the adverse judgment of undue influence was before this court. There a new trial was granted and on this ruling the contestants brought an appeal.

In the Cocanougher case, the testator was old, but strong-willed. She carried on her business but was in a physically incapacitated state. At the time of the will she selected her own attorney, executed the will in the absence of any beneficiaries and did so without the knowledge of any of the beneficiaries. The will was executed some twenty months before her death. In defining undue influence this court made it clear that in order to nullify a will there must be more than in-

fluence; undue influence must be shown to have been exercised. Influence becomes undue only when it overcomes the will of the testator, so that its free agency is destroyed. In effect, it amounts to the substitution of the will of another for that of the testator. The mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of a will.

The law in the cases concerning undue influence places upon the contestant the burden of proof in showing substantial evidence of undue influence. In determining this issue on undue influence we may consider:

(1) Confidential relationship of the person attempting to influence the testator;

(2) The physical condition of the testator as it affects his ability to withstand the influence;

(3) The mental condition of the testator as it affects his ability to withstand influence;

(4) The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and

(5) The demands and importunities as they may affect particular testator taking into consideration the time, the place, and all the surrounding circumstances.

Here to summarize, Boryan was never close to the deceased Maricich until the discovery of the bank account and the unusual interest displayed in Maricich's personal effects. Certainly Maricich's physical condition was not such that he could withstand much influence. He was even unable to attend his own guardianship hearings. The unnaturalness of the disposition is shown even though great effort was made by Boryan to establish a "Kum" relationship. Also the demands and importunities are shown to have affected Maricich so that his fear, of being committed as an insane person, if that testimony be believed, caused him to reject his friend of over forty years.

All of this amounts to substantial evidence to support the verdict and the order denying a new trial.

In In re Cocanougher's Estate, 141 Mont. 16, 25, 375 P.2d 1009, 1013, supra, this court quoting from In re Hegarty's Estate, 46 Nev. 321, 212 P. 1040, said:

" 'Court's have neither the right nor power to reframe the wills of decedents, nor to overthrow the expressed intent therein contained, in the absence of direct and substantial proof sufficient to bring the case within the well-established rules of law regarding undue influence.' " And, in considering whether or not the trial court erred in granting a new trial, this court again quoting from Herren v. Hawks, 139 Mont. 440, 365 P.2d 641, and Garrison v. Trowbridge, 119 Mont. 505, 506, 507, 177 P.2d 464, 465, stated that there are several well-established rules governing the granting of new trials and that innumerable cases in this state have laid down the general rule that the granting of a new trial is within the sound discretion of the trial court. Also in considering the propriety of the court's ruling in granting a new trial we keep in mind that, the granting, or refusal to grant, a motion for a new trial lies within the sound discretion of the trial court, and its order thereon will be reversed only for manifest abuse of that discretion; that an order, general in its terms, granting a new trial, will be upheld if it can be sustained on any ground stated in the motion therefor; that *such an order will not be set aside as readily as an order denying a new trial,* since the latter ends the case, whereas the former merely restores the parties to the position they occupied before trial. (Maki v. Murray Hospital, 91 Mont. 251, 260, 7 P.2d 228, 230. To the same effect is Walsh v. Butte, Anaconda, R. Co., 109 Mont. 456, 97 P.2d 325) ; and that *a stronger showing is required to justify interference with an order granting than one refusing a new trial.*

In view of the facts presented to the jury, as hereinbefore recited at some length, it appears there was substantial evidence to sustain its verdict. This is not to say there was no

evidence tending to support the appellant's position—there was.

Upon the motion for new trial the court, in sustaining the jury's verdict, found that substantial evidence existed in support thereof, and we hold that the court did not err in denying the motion.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and CASTLES concur.