No. 85-132

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

IN THE MATTER OF THE GUARDIANSHIP
AND CONSERVATORSHIP OF THE PERSON
AND ESTATE OF

MYRTLE MAE TENNANT,
An Incapacitated Person.

APPEAL FROM: District Court of the Twentieth Judicial District,
In and for the County of Sanders,
The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Mulroney, Delaney & Scott; P. Mars Scott, Missoula,
Montana

For Respondent:

Baxter, Fletcher & Hanson; Robert Baxter & Robert
Fletcher, Thompson Falls, Montana

Submitted on Briefs: Aug. 22, 1985

Decided: February 5, 1986

Filed: FEB 5 1986

_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment of the District Court of the Fourth Judicial District, Sanders County, the Honorable Douglas Harkin presiding, finding the will and deed of Mae Tennant to be void and awarding the conservator of her estate a money judgment against Thomas Evans and Raymond Williams. From this judgment Evans and Williams appeal. We affirm.

Myrtle Mae Tennant (Mae) was born on March 21, 1902, and was 79 and 80 years of age, respectively, during the summers of 1981 and 1982 when the facts pertinent to this appeal occurred. During these pertinent years, Mae lived alone in Thompson Falls, Montana, and was a widow without any children, her husband, Earl, having predeceased her in 1961.

In February 1972, Mae executed a will prepared by her longtime attorney, Eugene Mahoney. This will left specific devises to Boys Town, the Community Church in Thompson Falls and the Montana Heart Foundation. The residue of Mae's estate under this will was to be placed in an athletic scholarship fund for male athletes at Thompson Falls High School.

Commencing sometime in 1975, Mae's physical and mental health began to deteriorate. The record indicates that Mae began to neglect her personal hygiene, permitted the interior of her home to become an extraordinary mess, and began to drink heavily. In addition, the record shows that Mae's mental state had deteriorated to the point where she was not capable of handling her own financial affairs. Testimony shows Mae apparently believed she would always have whatever money she needed simply by writing another check. For this

reason, her close friends would balance her checkbook, deposit any funds she would receive, and would also pay her bills when she would neglect to pay them. Furthermore, Mae had developed a reputation among her friends and acquaintances as being a "soft touch." She would apparently give anything of hers to someone if she liked them, and could easily be talked into buying items and services she actually did not need. Mae's close friends, it appears, recognized her weakened condition and refused to take advantage of the situation.

It was in the above condition that Tom Evans (Evans) and Ray Williams (Williams) found Mae in June of 1981. Evans was the owner of yard and tree service from Missoula, Montana, and he contacted Mae to see if she was in need of his services. Mae immediately hired Evans, and his employee Williams, to care for her yard and trees despite the fact that Evans' brother, Bill, had done $2,500 worth of work in Mae's yard the previous summer, and Evans' brother, Jim, had charged Mae $1,150 for yard work he performed that May. Evans and Williams maintained and landscaped Mae's yard during the fall and summer of 1981 for which they were handsomely paid. Also during this time-period, Evans and Williams developed a close friendship with Mae. They made numerous trips to Thompson Falls to perform yard work for Mae and just to be with her. It is clear by the end of 1981, Mae regarded her relationship with Evans and Williams to be something much more than that of employer and employee.

In 1982, Evans and Mae again agreed that Evans would do Mae's yardwork, plus various other odd jobs for her. The record indicates that during 1981-1982, the two years Evans and Williams worked for Mae, they received at least $18,130

3

from her as payment for their services and also as so-called gifts. Furthermore, during 1982, Mae's friendship with Evans and Williams deepened. Evans brought members of his family to meet Mae in Thompson Falls and Mae became very attached to them. Evans, Williams and members of Evans' family made at least fifty trips during 1981 and 1982 to Thompsons Falls from Missoula to perform yard work for Mae and just to socialize with her. In Evans' own words, she (Mae) kept "hiring me just to have me . . . with her."

Sometime in the spring of 1982, Mae told Evans she wanted him and his family to have her house. Evans gave Mae the name of his attorney in Missoula, Tony Keast, and Mae contacted Mr. Keast to have him take care of the matter. Mr. Keast subsequently prepared a quitclaim deed giving Mae a life-estate in her real property and on her death passing the same to Evans. Mr. Keast also prepared a new will for Mae which left her real property to Evans and her personal property to Williams. The will and the deed were signed by Mae on August 4, 1982, and Mae's old will was physically destroyed on the same date. The deed was notarized by Mr. Keast and was subsequently recorded by Evans. Also, Mae's new will was witnessed by Mr. Keast and Evans.

During this period from 1981-1982, Mae's health and mental state continued to worsen. On October 12, 1982, at the insistence of a close friend, Mae visited Dr. Lulack in Thompson Falls. Dr. Lulack determined that Mae was diabetic, she was suffering from chest pains, dizziness and severe headaches, she had lost control of her bowl movements, and that she was physically unclean. Dr. Lulack was also surprised to discover that Mae's toenails were seven centimeters in length and that her toenails and feet were in

such a condition that she often wore galoshes. Further examination of Mae by other doctors revealed that she also had cancer of the colon. Mae subsequently underwent surgery for her cancer and it was found that her cancer had spread to her liver.

After her surgery, Mae was moved back to her home in Thompson Falls to recover from her illnesses, but it soon became apparent to Dr. Lulack that Mae's condition would require professional care. Dr. Lulack then contacted the Department of Social and Rehabilitation Services who subsequently petitioned the Sanders County District Court to have Mae declared an incompetent so that a guardian and conservator could be appointed for her. At a hearing held on December 28, 1982, Robert Baxter was appointed temporary conservator of Mae's estate and the Social and Rehabilitation Services was appointed the temporary guardian of Mae. On January 25, 1983, the District Court made the foregoing appointments permanent.

Thereafter, on February 1, 1983, the conservator filed an action in the Sanders County District Court to recover funds from Evans and Williams which they had received from Mae, and also to have set aside the deed and will executed by Mae on August 4, 1982.

Mae subsequently passed away on January 2, 1984, from complications of her illnesses, and shortly thereafter, Williams offered her will for probate in the Sanders County District Court. Williams further petitioned the District Court to terminate Mae's conservatorship. The District Court subsequently consolidated the probate and civil actions and ordered that the conservator retain all the assets of Mae's estate until a personal representative was appointed.

On October 29 and 30, 1984, a trial was held in the Sanders County District Court, before Judge Harkin sitting without a jury, on the appointment of Williams as the personal representative of Mae's estate, as well as on the complaint filed by the conservator. During trial, Judge Harkin personally viewed the property of Mae's in question.

Judgment was subsequently entered by the District Court on January 16, 1985, in favor of the conservator, finding the subject will and deed executed by Mae to be void and awarding the conservator a money judgment against Evans in the amount of $12,176.05 and against Williams in the amount of $800.

The appellants, Evans and Williams, present the following issues for review by this Court:

(1) Was the appointment of the conservator and guardian of Mae Tennant done in accordance with the statutory guidelines and if not, are the conservatorship and guardianship void ab initio?

(2) Was the conservator the real party in interest in pursuing the case once Mae Tennant died, and what are the conservator's duties upon the death of the protected person?

(3) Did the conservator meet his burden in proving that Mae Tennant did not have capacity to execute a deed and will on August 4, 1982, and to enter into contracts with the appellants?

(4) Did the conservator meet his burden in proving that the appellants exercised undue influence over Mae Tennant to procure her execution of the deed and will on August 4, 1982?

(5) Did the trial court err in making its findings of fact?

6

The respondent, the conservator, raises this additional issue for review by this Court:

(1) Whether the question of the capacity or standing of the conservator to bring this action while Mae Tennant lived was properly raised in this appeal?

The first issue presented by appellants and the single issue raised by the conservator can be summarily discussed. With regard to their first issue, the appellants claim the District Court did not follow Montana statutory guidelines in appointing the conservator and guardian for Mae and therefore both of these appointments are void ab initio (from the beginning). Specifically, the appellants argue the District Court failed to give Mae any notice of the conservatorship and guardianship proceedings, and thus the appointments made during these proceedings are void and the conservator lacked the capacity to file his present cause of action.

The conservator replies to appellants' contention by arguing that the issue of notice to Mae concerning the conservatorship and guardianship proceedings was not previously raised or presented to the trial court, and therefore this issue cannot now be properly raised on appeal. We agree. The rule governing the treatment of new issues raised for the first time on appeal is clear in Montana.

> We have repeatedly held that we will not consider questions of claimed err not previously raised or presented to the trial court. (Citations omitted.)

Northern Plains v. Board of Natural Resources (1979), 181 Mont. 500, 521, 594 P.2d 297, 309. At no time during the trial did appellants raise the issue of lack of notice to Mae concerning the conservatorship and guardianship proceedings.

7

Consequently, appellants' claim of err under issue no. 1 must be disregarded.

Under their second issue, the appellants argue that upon the death of Mae, her conservatorship should have been terminated by the District Court and therefore the conservator had no standing to pursue his present cause of action on behalf of Mae's estate. Furthermore, the appellants argue the conservator is not an "interested person" of Mae's estate, as defined by Montana's statutory law, and therefore he lacked the right to contest Mae's will. We disagree with both of these contentions.

First, § 72-5-429(3), MCA, provides that upon the death of a protected person the conservator must ". . . retain the estate for delivery to a duly appointed personal representative." This statute simply says that it is the duty of the conservator to continue to protect the ward's estate until a personal representative is duly appointed by the court. In the instant case, no personal representative has been duly appointed because the District Court refused to appoint Ray Williams, or any other person, to this position. Therefore, until the appointment of a personal representative by the District Court, the conservator must act to protect Mae's estate which in this case includes filing a lawsuit against the appellants.

Second, there is no question that the conservator is an "interested person" of Mae's estate with the right to contest her will. As the appellants correctly point out in their brief, the right to contest a will is purely statutory. In Montana, any party who is an "interested person" of a decedent's estate has the right to oppose or contest the probate of a will. See, Matter of Estate of Fender (1975),

8

168 Mont. 200, 541 P.2d 784. The phrase interested person is defined by § 72-1-103(21), MCA, in pertinent part as follows:

> Interested person includes . . . any others having a property right in or a claim against the estate of a decedent, ward or protected person which may be affected by the proceeding. It also includes persons having priority for appointment as personal representative and other fiduciaries representing interested persons. The meaning as it relates to particular persons may vary from time to time and must be determined according to the particular purpose of and matter involved in any proceeding.

Clearly, under the above statute, the conservator has an interest in Mae's estate. He not only has a property right in her estate, as discussed above, but the last two sentences of the statute also allow the conservator to be an "interested person" of her estate. Therefore, the conservator has the right to contest Mae's will.

With regard to issue three, the appellants claim the conservator did not meet his burden in proving that Mae lacked the necessary capacity to execute the subject deed and will on August 4, 1982, and to enter into contracts with the appellants. Once again, we disagree with appellants' contention.

This Court has previously set out the test for testamentary capacity in In Re Bodin's Estate (1965), 144 Mont. 555, 560, 398 P.2d 616, 619, as follows:

> [A] testator is competent if he is possessed of the mental capacity to understand the nature of the act, to understand and recollect the nature and situation of his property and his relations to persons having claims on his bounty whose interests are affected by his will. (Citation omitted.) The testator must have sufficient strength and clearness of mind and memory to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and the nature of the

9

> act which he is about to perform, and the
> names and identity of the persons who are
> to be the objects of his bounty, and his
> relation towards them. (Citations
> omitted.)

In applying these factors to the instant case, there is little doubt that Mae lacked the necessary testamentary capacity to execute the subject will on August 4, 1982.

First, it must be noted that Mae had drafted an earlier will in 1972. This first will was prepared by a person who had known Mae personally for many years and had served as her attorney. It benefitted persons and charities known by Mae's close friends to be the objects of her affection. This evidence indicates that at the time Mae executed the subject will on August 4, 1982, she was not fully aware of the natural or logical objects of her bounty.

Furthermore, the record strongly suggests Mae did not know the nature and extent of her property at the time she executed the subject will. Numerous witnesses testified that around the time Mae executed the subject will, she believed she had an inexhaustible supply of money. Even Evans testified in his deposition as follows:

> Q. Do you think she relied on the house
> for security for payment for her expenses
> in her old age?
>
> A. She didn't seem to be concerned about
> her financial--she acted like she had
> lots of money.
>
> Q. Did she ever express concern to you
> about her financial security?
>
> A. No she didn't. She said she had lots
> ID's [sic] or something, that her and
> Irwin paid in for 30, 40 years. She was
> financially affected for the rest of her
> life.
>
> Q. It's your opinion, then, that she
> felt that she was well fixed at that
> time, exclusive of ownership of the
> house; is that correct?

A. Yeah, I think she thought she was well fixed?

Q. Did she ever discuss specifically with you how much money she had in other investments?

A. No, she didn't.

However, the true facts are that at the time the conservatorship was established, Mae's cash and cash equivalents totalled only about $4,500.

Also, the record strongly shows that at the time she executed the subject will, Mae did not know the true nature of the act she was performing. Mae's deposition taken shortly before her death reads as follows:

Q. Did you discuss the contents of your will before you signed the will?

A. I don't remember that either. I don't think I did.

Q. Who were the witnesses to your will?

A. I don't think I had any. I don't remember, unless it was Nieva Wood.

Q. Well, do you remember who was present in the house at the time you signed the will, Mae?

A. No, not offhand I don't.

Q. Mae, did you have a will before you made out this will?

A. No I didn't.

Q. Had Gene Mahoney not made out a will for you?

A. No.

The only evidence to support the conclusion that Mae knew the true nature of the act she was performing came from the testimony at trial of Evans, Williams and Tony Keast. This Court submits that the weight given to the testimony of Evans and Williams must be balanced against their personal interest in the outcome of this case. In fact, the District Court

11

made the following special finding of fact: "the testimony of Tom Evans is replete with inconsistencies; he is not a credible witness." Furthermore, the weight given to the testimony of Tony Keast must also be questioned because of his apparent lack of knowledge of the formalities necessary to draft a valid will in Montana. Section 72-2-305(3), MCA, clearly provides that any beneficial devise in a will to a subscribing witness is void. Mr. Keast permitted Evans, a principal beneficiary under Mae's will, to be a subscribing witness to her will in obvious violation of this statute.

Finally, it is important to note that substantial evidence exists that Mae's mental incapacity extended over a long period of time and most certainly included the date on which the subject will and deed were executed. As described in the facts section of this opinion, testimony indicates Mae's mental incapacity began to surface as early as 1975. Therefore, in light of the above discussion, this Court has little hesitation in concluding that Mae lacked the necessary testamentary capacity to execute the subject will, and the subject will is hereby declared void.

Next, the same facts which lead us to the conclusion that Mae lacked the necessary capacity to execute the subject will, also lead us to the conclusion that Mae lacked the necessary capacity to execute the subject deed. The standard of competence necessary to execute a valid deed is set out by this Court in Silloway v. Jorgenson (1965), 146 Mont. 307, 406 P.2d 167. In Silloway, we held that a grantor's mental ability to execute a valid deed required sufficient capacity to understand in a reasonable manner the nature and effect of the act undertaken.

Mae's lack of understanding regarding the execution of the subject deed is established by her own testimony. When she was questioned about her understanding of the document and was shown the deed physically, these questions and answers were exchanged:

Q. Mae, I will show you a photocopy of what purports to be a quitclaim deed. Does that look like something you have seen before?

A. Yes.

Q. Can you identify that?

A. Yes.

Q. What is it?

A. Well, it's--I don't know if I know the proper name for it, but it's a deed.

Q. And who is the deed from? Look up here, Mae.

A. Thomas J. Evans, Sanders County.

Q. Well, Mae, you seem to be a bit confused by that document. Are you familiar with deeds at all?

A. No, I'm not familiar with no deeds.

Q. Do you understand what deeds are all about?

A. Well, I'm getting to learn a little bit about it.

Q. You mean you are getting to now; is that right?

A. Yes, . . .

Mae further summarized her understanding of the subject deed and its consequences when she confessed the following in her deposition:

Somebody has done all kinds of things that I have no knowledge concerning my business and concerning me and my property and everything. I don't know a thing about what all they are doing. I don't understand the whole thing.

13

It is clear from the above testimony, in addition to the other evidence presented by the record, that Mae was thoroughly confused by the deed and did not understand its nature or effect. Therefore, this Court agrees with the District Court's finding that Mae did not have the requisite mental capacity to execute the subject deed and it is hereby declared void.

Furthermore, for the same reasons why Mae lacked the capacity to execute the subject deed and will, we hold Mae lacked the necessary capacity to enter into binding contracts with the appellants for yard care services. Consequently, we hold such contracts entered into between the parties to be rescinded and declared void.

The fourth issue presented by the appellants asks this Court to determine if the conservator also met his burden in proving that the appellants exercised undue influence over Mae to procure her execution of the subject deed and will. We hold the conservator met his burden.

The case of In Re Maricich's Estate (1965), 145 Mont. 146, 400 P.2d 873, is the lead case in Montana for determining the existence of undue influence on a testator. The elements found in Maricich are essentially the same as the statutory elements for undue influence found in § 28-2-407, MCA. The test in Maricich provides as follows:

> (1) Confidential relationship of the person attempting to influence the testator; (2) The physical condition of the testator as it affects his ability to withstand the influence; (3) The mental condition of the testator as it affects his ability to withstand influence; (4) The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; (5) The demands and importunities as they may affect particular testator taking into

14

> consideration the time, the place, and
> all the surrounding circumstances.

Maricich, 400 P.2d at 881. It should also be pointed out that this Court in Patterson v. Halterman (1973), 161 Mont. 278, 505 P.2d 905, held that the tests for undue influence which are pertinent to wills are also pertinent to deeds.

In analyzing the instant case under the elements listed in Maricich, it is clear to this Court that the appellants exercised undue influence over Mae to procure her execution of the subject deed and will. The initial four elements of the Maricich test have already been established in this opinion. A confidential relationship existed between Mae and the appellants; Mae was a person especially susceptible to the exercise of undue influence because of her mental and physical condition; and Mae made an unnatural disposition of her property by the subject deed and will by reason of her pre-established estate plan of long standing which left her estate to various charities and a scholarship fund. Finally, with regard to the fifth element of the test, the record clearly shows that demands and importunities were made upon Mae by the appellants. This point is well illustrated by the fact that the appellants solicited Mae's work, when it was obvious that she simply did not need such work done. Bill Evans, Tom's brother, apparently did $2,500 worth of work for Mae in 1980 and Jim Evans, Tom's brother, charged Mae $1,150 for work that he did for her in May of 1981, just a month before Tom Evans started working for Mae. It appears Evans and Williams saw a lady who, because of her condition, could not say "no" and they took advantage of the situation.

Therefore, in light of the above discussion, this Court holds that the appellant exercised undue influence over Mae

15

to procure her execution of the subject deed and will, and we once again hold these two documents to be void.

The fifth, and final, issue raised by the appellants is whether the findings of fact and conclusions of law of the District Court are supported by the evidence. In response to this issue, we note this Court will not set aside the trial court's findings of fact unless shown to be clearly erroneous. Rule 52(a) M.R.Civ.P., states in pertinent part:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Furthermore, findings of fact are not clearly erroneous if supported by substantial credible evidence:

> This Court's function . . . is not to substitute its judgment in place of the trier of facts but rather it is "confined to determine whether there is substantial credible evidence to support" the findings of fact and conclusions of law. (Citations omitted.) Although conflicts may exist in the evidence presented, it is the duty and function of the trial judge to resolve such conflicts. His findings will not be disturbed on appeal where they are based on substantial though conflicting evidence. (Citations omitted.)

Olsen v. Westfork Properties, Inc. (1976), 171 Mont. 154, 157, 557 P.2d 821, 823.

In light of the above standard, we conclude there is substantial credible evidence on the record, as explained in this opinion, to support the findings of fact and conclusions of law of the District Court.

It should also be noted that based on the record, Mae's original will drafted in 1972 may not be reinstated by this Court under the doctrine of dependent relative revocation. Montana specifically recognizes this doctrine which provides

that if a testator revokes or destroys his old will and substitutes another which fails for any reason, a rebuttable presumption arises that he would prefer to have his property distributed pursuant to the earlier will than according to the intestate succession statutes. Matter of Estate of Patten (1978), 179 Mont. 299, 587 P.2d 1307. However, an essential element of this doctrine is that the new will and the old will of the testator must reflect essentially the same dispositive plan. In the instant case, Mae's new will and old will clearly do not reflect the same dispositive plan. Therefore, this doctrine does not apply to the instant case and Mae's property must be distributed according to Montana's intestate succession statutes.

The judgment of the District Court is affirmed.

Justice

We concur:

Justices

17