YUTTERMAN v. STERNBERG (two cases).

Nos. 10675, 10676.

Circuit Court of Appeals, Eighth Circuit.

Nov. 19, 1936.

Rehearing Denied Dec. 3, 1936.

Fadjo Cravens, of Fort Smith, Ark., for appellant.

Harry P. Daily, John P. Woods, and J. S. Daily, all of Fort Smith, Ark., for appellee.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

FARIS, Circuit Judge.

On the 16th day of October, 1934, one John D. Yutterman was adjudicated a bankrupt. During the years 1933, and up to his bankruptcy in 1934, he had been engaged in the retail grocery business and in the sale of meats and produce. After adjudication and on February 11, 1935, one John L. Yutterman, who is the father of the bankrupt and the appellant herein, filed a claim against the bankrupt estate on a demand, promissory note, dated December 30, 1933, and for the sum of $1,532. (In numerals in the margin the amount is written, $1,532.99.) Later, and on March 18, 1935, appellant filed a second claim against the estate for the sum of $3,571.14, bottomed, as it is alleged upon a contract, dated January 3, 1934, pursuant to which the bankrupt agreed to pay appellant, for the year 1934, for his services in addition to his salary, as assistant manager of the store, the sum of 2 per cent. of the sales made by the store. This contract was attached to the claim. Because it casts by clearest inference much light upon what may fitly be denominated the entire set up, we copy it verbatim et literatim thus: "Fort Smith, Ark. 1/3/34. I here the undersign agree to pay the said party my father John L. Yutterman for the said year over the said date and over salary 2% of sales for this coming year 1934 as an employee an Ast. Manager.

"[Signed]   Rogers Ave. Cash Store,
"By John D. Yutterman."

Objections were filed by appellee, as trustee of the bankrupt's estate to the allowance of each of the claims, and the referee, after hearing the evidence, disallowed both of them. Appellant sued out petitions for review; but the District Court after a consideration of the evidence sent up, affirmed the orders of disallowance made by the referee and dismissed the petitions for review.

Thereupon, in due course and form, separate appeals were taken to this court. The claims were heard together, are here briefed together, were consolidated here, and so they will be considered and disposed of by this court in a single opinion.

The claims were presented in the usual forms. The hearing was summary, but the objections filed by the trustee set up that each of the claims was without consideration and bottomed upon fraud and collusion between the son, the bankrupt, and his father the claimant and appellant here, with the intent and purpose of making a gift to the claimant.

■■ It is contended by appellant that the negotiable, promissory note imported a consideration, and so there was a consideration as a matter of law, and moreover that the verified claims made as to each of the demands constituted prima facie evidence of their validity. So that the burden was thrown upon the trustee, appellee herein, to show a want of consideration, which burden he failed to carry. We may assume the correctness of the rules of law thus urged. But the rules are based on the weight of the evidence and not on the source thereof. True, in the case at bar, the trustee was compelled, for lack of other witnesses, to call the bankrupt and the so-called bookkeeper, both of whom, obviously, were most hostile witnesses. But if so it be that their testimony showed a wholly unreasonable and incredible consideration, for the two claims, neither the referee, the trial court, nor this court was, or is bound to believe it. And here neither the referee nor the trial court did believe in the existence of the consideration to which the witnesses testified. If then, there are facts and circumstances of substance found in the evidence to uphold the view taken by the referee and the trial court, we ought not to disturb their finding.

The situation here is in entire principle, and in many facts strikingly similar to that under discussion by this court in the case of Maners v. Ahlfeldt, 59 F.(2d) 938, at page 939, wherein we said: "Whether the demand of appellant constituted a just claim against the bankrupt estate involved the consideration of the testimony, not without conflict, and the credibility of the witnesses,

in view of the relationship existing between the bankrupt and appellant, their interest in the case, and the more or less improbable accounts that were given concerning the loan, and the manner and circumstances under which it was said to have been made. It was peculiarly a case in which the opportunity to see and hear the witnesses was of importance in determining their credibility. The evidence was heard by both the referee in bankruptcy and the District Court, and in each instance the ruling was adverse to the claim. The finding made ought not to be disturbed unless it can be clearly ascertained that some error of law or mistake of fact had led to an erroneous conclusion. Page v. Rogers, Trustee, 211 U.S. 575, 29 S.Ct. 159, 53 L.Ed. 332; First National Bank v. Abbott (C.C.A.8) 165 F. 852; Doyle Dry Goods Co. v. Lewis (C.C.A.8) 5 F.(2d) 918; Houchin Sales Co. v. Angert (C.C.A.8) 11 F.(2d) 115; In re Trimble (C.C.A.8) 55 F.(2d) 165; Manson v. Mesirov (C.C.A.) 254 F. 799, certiorari denied 249 U.S. 615, 39 S.Ct. 389, 63 L.Ed. 803; Schmid v. Rosenthal (C.C.A.) 230 F. 818; Ohio Valley Bank Co. v. Mack et al. (C.C.A.) 163 F. 155, 24 L.R.A.(N.S.) 184."

█ The record is so replete with loose and obscure statements and contradictions, that we have found it well-nigh impossible to get an accurate understanding of the actual facts. But it seems that appellant had been a farmer with no experience in the mercantile business, but some experience as a fruit inspector. In January, 1933, he began work for his son, the bankrupt. For his services as assistant manager and in charge of the produce department, he was to get 45 per cent. of the profits. Whether the drawing account variously stated at $30, $35, $42, and $52 per week was to be deducted, does not clearly appear. We assume that it was; for the bankrupt uniformly spoke of it as a bonus, and clearly the alleged contract for 1934 was a bonus. For the major part of the years 1933 and 1934, to the day of adjudication, he was paid weekly a salary at the rate of $52 per week. The manager of the meat department was paid $35 per week.

No books were kept, till some four or five weeks prior to bankruptcy. And on these books, or any other there is no showing of either the contract, the note, the profits, if any, or the amount of sales for 1934. At the end of 1933, appellant says he asked for an accounting as to his part of the profits for the year 1933. He did not know what these profits were, or if there were

any, nor did the bankrupt or any other witness in the case know. But it was agreed, appellant and the bankrupt say, that the sum of the profits due him should be figured in proportion to what had been drawn out of the business by the bankrupt, which was $600 or $700 per month, or $7,200 or $8,400 for the year 1933. So that the sum drawn by the bankrupt should constitute 55 per cent. of the profits for the year, and the amount due appellant should be 45 per cent. of such profits. Yet appellant, he says, settled his claim for profits for the year 1933 for about $4,000 (the same being the total of his weekly drawing account plus the note); whereas, it is mathematically obvious that on the alleged basis of calculation, his share should have been some $1,900, or $2,900 more, depending on whether the bankrupt drew from profits (or capital) $600 or $700 per month. It is a minor criticism that the sum written in the note does not agree with the sum stated in figures in the margin thereof. From this we think a strong inference arises that the figures put into the note constituted a mere guess, made when bankruptcy became imminent.

No other employee, though one at least was experienced in his department, was paid over $35 per week. As said already, no books were kept by the bankrupt, and on such records as existed, no memorandum, intimation, or inference is found as to the existence of either the note, or the contract for either the year 1933 or 1934. The schedules were not offered, but the bankrupt testified that neither claim now urged by appellant was scheduled as a claim against the estate. He explained the omission of the two claims, by the statement that he was ill, and one Otto, called the bookkeeper, prepared the scheduled list of debts; while Otto says the claim on contract was not listed, but he avoids a direct answer as to the note by resort to a negative pregnant.

It is, we think, impossible for an impartial listener to have heard the testimony in this case as the referee did, or to read it as the trial judge did and this court has done, without reaching the conclusion that neither of these demands was well founded, or put forward in good faith, but that each of them constitutes a mere crude effort of appellant to reap where he has not sown.

It may be conceded that the meager record as to the amount of the gross sales for the year 1934, as the witnesses related its showing—this record is not in evidence—tends to show a sum sufficient to warrant

payment to appellant of the sum claimed by him, when figured at the rate of 2 per cent. thereof; but the difficulty largely is as to the existence and good faith of the alleged contract on which the demand is based. No one except the appellant and his son knew of it, or had ever heard about it, and no book or other memorandum made any, even the remotest, reference to it. It was a mere illiterate, careless and hasty scrawl that could have been made at any time, from bankruptcy to the day of its presentation, for allowance, some four months after bankruptcy. It was a most important paper, yet the appellant did not even take the trouble to accept it in writing. We are merely stressing the fact, and not ruling that acceptance in writing was necessary, as a matter of law, if performance were had by the promisee. By its alleged terms it provided for an annual compensation to appellant of more than $6,000, while another, and next to appellant the highest paid employee, for doing well-nigh the identical work, got only $1,680 per year. True, appellant was rated as assistant manager, but the nature and extent of his management may be inferred from his admissions of his utter ignorance of the condition of the business, and whether losses were occurring, or profits being made.

But counsel for appellant strenuously contends that taking the testimony of the witnesses at its face value, which he insists this court must do, it conclusively shows that both claims represented honest and bona fide debts due to the appellant. It may be conceded for the sake of the argument that judged by mere lip-service this is true. But the insistence overlooks the legal prerogative of the referee, the trier of the facts. His was the lawful privilege of taking into consideration the manner and appearance of the witnesses on the stand; their way of testifying; the probability or improbability of the testimony which they gave; their respective opportunities to see and hear the things about which they gave testimony; and their apparent capacity and willingness to truthfully and accurately relate what they saw and heard. He could consider the contradictions, errors, and improbabilities in the situation as detailed, and the kinship and business relations of the witnesses, and doing all these things, which were among his legal rights, reach the truth if he could.

The rule as to deference due to a referee has been stated lately by us in the case of Rasmussen v. Gresly, 77 F.(2d) 252. The late Judge Lamm has given us in graphic language embodying both good law and good literature, in the case of Creamer v. Bivert, 214 Mo. 473, loc. cit. 479, 113 S.W. 1118, 1120, the reasons back of the rule, thus: "The bulk of the testimony was oral. In such condition of things, while this court has said over and over again that the whole record must come here in equity cases, so that (sitting as the final arbiter in chancery) we may weigh and decide de novo and thus do equity, yet the court is also fond of saying that deference should be given to the trial chancellor. He sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching overeagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify. Therefore, where an issue in equity rests alone on the credibility of witnesses, the upper court may with entire propriety rest somewhat on the superior advantage of the lower court in determining a fact."

In principle, the case at bar can hardly be distinguished from the Rasmussen Case, supra, except that in that case, we deferred to the referee's findings of fact, when those findings had been overruled and reversed by the trial court. Here, the trial court sustained the findings of the referee. There, as here, the contention was that the testimony, being undisputed and, as alleged, neither unreasonable nor improbable, must be accepted by the referee as true. We sustained the referee, however, even though the trial court had refused to do so. Here, we are unable to say, that the testimony of those witnesses

who undertook to sustain the validity of the demands in dispute was either reasonable or probable.

Let the case be affirmed, with costs to appellee.