JOHN JANGULA, Plaintiff and Respondent, v. UNITED STATES RUBBER COMPANY, a Corporation, Defendant and Appellant.

No. 10830.

Submitted on Petition for Rehearing January 11, 1966.
Decided on January 28, 1966.
410 P.2d 462.

Mr. Justice Adair dissented.

Corette, Smith & Dean, Kendrick Smith (argued), Butte, for appellant.

Doepker & Hennessey, M. J. Doepker (argued), Butte, for respondent.

Church, Harris, Johnson & Williams, Cresap S. McCracken (argued), Douglas C. Allen, Hoyt & Bottomly, John C. Hoyt (argued), Great Falls, John Marriott Kline, Glasgow, amicus curiae.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment entered pursuant to a jury verdict in a negligence case. The appellant was defendant below and will be referred to as the defendant. The respondent was plaintiff below and will be referred to as plaintiff.

· Plaintiff brought an action alleging that defendant was engaged in the manufacture of rubber footwear, that plaintiff

on October 31, 1958, purchased a pair of boots of defendant's manufacture from a dealer in rubber boots in Butte, Montana. Plaintiff alleged that said boots were of defective workmanship and contained irritant materials from negligent compounding which could not be discovered by ordinary observation, but also alleged that "said boots were not inherently dangerous." Plaintiff alleged that defendant knew, or had reason to know, that the boots would be dangerous to a wearer and would infect the skin and failed to warn the plaintiff. The specific alleged defective irritant materials were named in the complaint as consisting of chemicals known as amines, formaldehyde, Aminox, Flectol H. B X A, reclaimed rubber, Tuex, and Monex. Plaintiff alleged that there was defective workmanship and negligent compounding so that chemicals and substances were released in the ordinary wearing of the boots and would irritate the skin in hot, wet places underground.

Plaintiff further alleged that after wearing the boots in the mine his feet became irritated and infected, which condition spread over his body and disabled him for three weeks in November 1958, and about three weeks in May 1959, to his damage.

A second cause of action was in express warranty but a demurrer to that cause of action was sustained by the trial court. As to this ruling on the demurrer the plaintiff has assigned cross-assignments of error as will be set out later.

The answer denied all of the allegations as to negligence.

Jury trial was had and a verdict returned on November 22, 1963. Judgment was entered and a motion under Rule 50, M.R. Civ.P., to set aside the verdict and judgment and enter judgment in favor of defendant in accordance with the motion for directed verdict or, in the alternative, to grant a new trial, was made and denied. This appeal followed.

Twelve specifications of error are asserted. Defendant has divided these into four groups which are as follows: (A) that the evidence was not sufficient to sustain the verdict; (B)

error in instruction; (C) verdict was contrary to the evidence; and (D) errors in admission of evidence.

We shall discuss the plaintiff's evidence, both as to its sufficiency under (A) above and as to whether it is contrary to the findings of the jury under (C) above. To do so we shall set forth a brief summary of the evidence of plaintiff's witnesses which, in part, will involve a discussion of (D) above as to errors in admission of the evidence. Then, we shall revert to the specifications of error as they refer to the defendant's motion at the end of plaintiff's case for a directed verdict and the defendant's motion to set aside the verdict made pursuant to Rule 50, M.R.Civ.P.

The first witness, Mike Leding, testified on the matter of notice that he had trouble with some boots in 1956, with United States Rubber boots, went to see plaintiff's counsel who wrote a letter to the defendant in Seattle, the letter being Exhibit 1. One of the Leding boots was branded and sent to the defendant. Plaintiff's counsel wrote a further letter dated March 25, 1957. All of this evidence was on the issue of notice, and on cross-examination a reply letter was introduced on the same subject, from which it appears that the defendant had negative findings on these boots. Defendant asserted that it made thousands of pairs of boots of this type, that a thorough chemical analysis, including ultraviolet absorption analysis showed nothing and the only logical conclusion was that Mr. Leding may have used socks containing some abnormal material.

The second witness was plaintiff Jangula who testified that he was a miner from 1947-1958, and that he had had no skin troubles prior to 1958. In 1958 he bought United States Rubber boots either at Hennessey's store or Penney's store and wore them at the Mountain Con Mine. He wore them in a stope where the temperature was about 86 degrees where he was drilling, slushing and timbering. He wore cotton socks laundered with Ivory soap and said he had never had any breaking

out on his body. He said he had some itching on wearing them the first day and by the end of the third day after he started to wear them he ended up in the hospital. His feet were wrapped in towels and he was treated by Dr. Rotar. He said he was in the hospital for two weeks. Later he went back to work, wore a Para Cord boot of a different manufacturer and had no trouble. He then went back to wearing the same U. S. Rubber boot and broke out on the first day and went back to the hospital for two weeks according to his version. He said he had no trouble now with wearing Para Cord boots. On cross-examination, he thought some of the hospital records were wrong, said he never told Dr. Staples that it was a fungus infection and Dr. Staples did not tell him that it was a possible fungus infection. He specifically said that he did not know what caused his trouble, except it occurred while wearing U. S. Rubber Company boots. He served in the South Pacific and said he had never had jungle rot.

The third witness, Dr. J. C. Shields, who has practiced in Butte since 1917, testified to records from the hospital in November of 1958.

Dr. Shields had no independent recollections of these hospital episodes because there were too many patients. He read from the records. The first record was signed by Dr. Rotar who stated at the end of the record the following:

"Impressions—Possible fungus infection (secondary to contact rubber boots) of legs and dorsum of the feet; second, acute lymphadenitis, inguinal regions, that's due to absorption of the inflammatory products through the lymph flow; Inguinal Regions, secondary."

The final diagnosis was "Atopic Dermatitis both legs." On the second admission of Mr. Jangula in April of 1959, Dr. Shields read from the record showing that the diagnosis was again atopic dermatitis. At that time he was cared for by Dr. Staples who said that the patient should not wear boots. The history given to Dr. Staples at the time was as follows:

"Present complaints, skin eruptions [now, this is 4-28-59] skin eruptions and itching of both legs, ankles and feet; admitted for the above condition.

"Claimed that he had had the condition off and on for about six (6) or seven (7) months and stated it might be due to rubber boots. Started as fungus infection on the toes, finally spread all over the feet, ankles and away up the legs to the level of the rubber boot edges.

"That really should be read 'top,' instead of 'edges.' Confined for treatment.

"Has had above condition for about six (6) or seven (7) months off and on up to the present. For other details please refer to past records."

Upon the patient's discharge from the hospital Dr. Staples made a summary as follows:

"Summary on discharge: Admitted 4-28-58 with Atopic Dermatitis of both of lower legs and ankles. Moist packs and medicines brought about resolutions and improvement. Signed Dr. E. E. Staples."

Based upon a hypothetical question, Dr. Shields testified that he thought the cause of the trouble *"was the boots—the rubber boots,"* meaning the U. S. Rubber boots, and that the boots were "the positive factor."

The next witness by deposition was Dr. C. E. P. Jeffreys, a consultant chemist and technical director of Truesdail Laboratories in Los Angeles with a good background and professional experience and affiliations, who was familiar with rubber and procedures for testing the same. He examined the Leding boot, an exhibit in this trial, to determine whether there were materials in the boot structure which would diffuse and give rise to skin irritation. In this testing of the Leding boot he found no volatile materials. With a solution of artificial perspiration used on this boot he found indications of an amine, found a positive test for aromatic amine, but the complexity was such that he could not be certain what he had and the only com-

pound or class of compound "which we identified specifically from this was alkyl secondary amines. We did obtain a positive test for aromatic amines, but they were not present in sufficient amount to obtain an infrared spectrum." He was not able to identify with certainty Monex, Tuex, and other materials. We point out that this was an examination of the Leding boot.

Dr. Jeffreys had information on the compounds used in the manufacture of rubber boots, took those into consideration and considered the formulae and explained some of the components of rubber, such as accelerators (which accelerate vulcanization), and which he described as quite toxic or severely toxic. He said there were two types of compounds "which if they remain in appreciable amounts, would be expected to be irritating." He also explained inhibitors (which slow down oxidation) and said there were possibilities of residues of some of those materials. On preliminary examination by this defendant he described some of his tests and the use of an infrared spectrophotometer. On the Leding boot he said that he was not willing to say specifically that amines were present. He testified as to other tests and generally on the subject of testing.

Specifically on the Jangula boot, he received the same and carried on the same tests and stated that he did not obtain the same spectrum. Specifically, he stated that he was not able to separate or identify the materials. His exact testimony was as follows:

"I obtained extracts from the boot marked Jangula and made the infrared spectro examination and did not obtain the same spectrum as I had obtained on the previous boots. The spectrum was complicated and I was not able to separate—I made an attempt to separate components of the extract by chromatographic separation but have not been able to separate in sufficient purity material to identify it as in the case of the previous two boots."

In answer to a hypothetical question (to which objection was

made and which will be referred to later), the Doctor said that "it would seem hard to conclude anything other than that this particular boot contains *something different* from the boot of the same manufacture the man had worn previously and that either because of the composition or the differences in the complete cure of some factor, there was an irritating compound that came in contact with his skin and could lead to the dermatitis described." (Emphasis added.) He admitted, however, that he was not able to separate and identify any of the items listed as irritant materials in plaintiff's complaint, and did not make any quantitative determinations. He did not know what different materials were in the boots, nor did he know how they became present there.

The final witness for the plaintiff was Dr. Bernard F. Ryan, a dermatologist with good background, education and experience. He has had experience with surgeons who have had contact dermatitis from wearing rubber gloves and sometimes it was caused from soap or detergents used in washing. Where a person becomes sensitive there is a use period or a latent period and he says that allergic reaction from rubber usually shows up later than five days. He examined plaintiff Jangula on December 1, 1959, took his history, made some patch tests using Duke's Elastoplast, and in 24 hours, had positive reactions. On preliminary questions by defendant he stated that his opinion was not related to what substances were or were not on the lining of the boot or the boot itself. On a hypothetical question which asked the doctor to assume that the wearing of the boot resulted in the washing out or freeing of irritant chemicals (and to which a separate specification of error is directed), the doctor testified:

"My conclusion is based on the sequence of events on the development of the dermatitis and the developments of the patch tests that the aforesaid dermatitis was directly due to contact with one or another ingredient used in the manufacture of these boots. And that it was probably allergic or hypersensi-

tivity type of dermatitis. *But this fact cannot be proven without additional patch tests of the various ingredients used in the manufacture of the boots, et cetera."* (Emphasis added.)

He also testified:

"The fact that he wore this same type of boot that produced the dermatitis previously without trouble would suggest that there was some change in the manufacturing process for that batch of boots, *perhaps."* (Emphasis added.)

In both instances it is significant that the doctor is speculating and has specifically testified that *further patch testing would be required to prove whether ingredients used in the manufacture of the boot would have anything to do with the allergic manifestation.* He did assume that there was some change in manufacture, but he had no idea what the change in manufacture was. He did not have any idea as to what chemicals might have been present in the change of manufacture and he did not have in mind that there was present any particular chemical on the lining of the boot.

The Doctor did not make any blank patch tests and did not know whether the patient reacted to the adhesive Duke's Elastoplast. Asked to assume that Dr. Jeffreys, the chemist, could not separate or identify any particular materials or chemicals on the lining of the boots, Dr. Ryan said that you could not attribute the dermatitis to any particular material or chemical. He could only say that *it was something in the boot* and he could not be sure "without further patch testing of the various boot materials." Finally, he said there is nothing *based on a reasonable medical certainty to which you can point your finger at a specific chemical ingredient which caused this man's condition.*

Mary E. Sheehan, medical librarian, testified as to charges for room and board at the hospital and George P. Murphy testified as to the earning records of Jangula. Plaintiff rested his case.

At this point defendant moved for a directed verdict, which was denied by the court.

The plaintiff had been able, over objections, to put before the jury other matters, which we have heretofore referred to in our grouping of specifications of error as (D) errors in admission of evidence. Specifically they are (1) that a hypothetical question was asked Dr. Jeffreys. The long rambling question assumed the presence of materials on the surface of the boots which actually were not present, and assumed the presence of materials which the witness as a chemist, after a careful and complete test, was not able to separate nor identify, and, in fact, proved by his own tests did not exist. Over objection Dr. Jeffreys was allowed to state his opinion as follows:

"Well, *on the basis of those facts* it would seem hard to conclude anything other than that this particular boot contains something different from the boot of the same manufacture the man had worn previously and that either because of the composition or the differences in the complete cure of some factor, there was an irritating compound that came in contact with his skin and could lead to the dermatitis described."

"Those facts" referred to by Dr. Jeffreys were contrary to what he, as an expert, found to be the fact. Also "those facts" were never produced. Thus the hypothetical question was outright speculation and contrary to the evidence and thus improper. The answer was sheer speculation and not based upon evidence before the court. Such is error. (In re Murphy's Estate, 43 Mont. 353, 374, 116 P. 1004; Green v. Milwaukee Mechanics' Ins. Co., 77 Mont. 505, 517, 252 P. 310; Burns v. Fisher, 132 Mont. 26, 313 P.2d 1044, 67 A.L.R.2d 1; Moffett v. Bozeman Canning Co., 95 Mont. 347, 353, 26 P.2d 973.

In addition, two specifications of error under (D) above as to two hypothetical questions asked Dr. Ryan are the subject of specifications of error. Again, the questions were long and rambling and contained the "facts" concerning what substances were in the boots that plaintiff's own evidence disproved. Dr. Ryan was not concerned with what substances

were or were not present, and he testified that additional patch tests would be necessary before proof could be had. Thus, it is seen that his opinion should not have been allowed. Dr. Ryan was also permitted to give his opinion on a change in production of the boots. We shall not dwell on this because we have already found prejudicial error in the opinions of Dr. Jeffreys and Dr. Ryan.

 The rules relating to testimony of an expert witness have been set forth in Irion v. Hyde, 110 Mont. 570, 105 P.2d 666. The expert must first testify to the facts within his own knowledge or based upon his own observation upon which his opinion is based. He must have the training and experience to draw a correct inference from facts outside the range of ordinary human experience. The judgment of an expert will not support a verdict when opposed by undisputed facts and the dictates of common sense. Where, as here, the conclusions of the experts are based on facts which do not exist, or are the result of an inference, admission over objection is erroneous.

What we have heretofore found not to be proof of negligent manufacture or proof of harmful or irritant substances or proof of proximate cause or medical causation, is argued in respondent's brief in a summary fashion as follows:

"They [the jury] heard and listened to the testimony of the plaintiff himself, the doctors that tended to him and the demonstrated fact that when those boots were put on he was immediately poisoned by the simple wearing of the boots. In all common sense it just seems to be outrageous for appellant to argue that a situation of that kind does not show that there has been demonstrated a very substantial irritant and poisonous material that damage the respondent in this case."

This statement reflects a lack of proof, but would seemingly rely on the doctrine of res ipsa loquitur—that the thing speaks for itself. As to this doctrine, respondent states:

"There certainly is in this case a very strong element respecting a thing speaking for itself, because [sic] the doctrine

standing alone may not be applicable, but the circumstantial evidence surrounding it and tying into it is unanswerable and overwhelmingly against the contention of the appellant."

Additionally the respondent's brief refers to many matters not in the record, as if to implement somehow what is simply a lack of proof. Finally, the respondent quotes language from Patterson v. George H. Weyer, Inc., 189 Kansas 501, 370 P.2d 116, 119, to the effect that it was not necessary to produce a chemical analysis of the products but only facts from which a "simple, reasonable and common-sense inference could be drawn by the jury that plaintiff suffered injury * * * as a direct result of the application of the permanent wave. This, coupled with the definite medical testimony of the dermatologist that in his medical opinion the chemical trauma suffered by the plaintiff was due to the solution used in waving plaintiff's hair, was sufficient to establish a causal relation * * *."

That case is not applicable here. It was tried on an implied warranty theory, and the very proof of negligence we have been discussing was not inquired into.

With reference to the instructions given by the court and specified as error by the defendant, which we refer to as (B), we must agree with defendant that under the evidence adduced in this case they were inapplicable and should have been refused. We agree with plaintiff's contention that instructions that relate to any of the elements of the case must necessarily make some comparisons between the law and the evidence in the case. That is the point raised by defendant, that they do not, that the evidence to permit the giving of the complained of instructions was lacking.

As previously stated, plaintiff has made cross-assignments of error. To particularize our discussion, we shall reiterate the nature of the complaint, keeping in mind that the alleged injury occurred in October or early November, 1958, and complaint was filed September 16, 1959, under our old code pleading and practice.

The complaint alleged that the boots *were not inherently dangerous,* and reasserted *negligent manufacture.* In the second cause of action, it was alleged that the defendant had *expressly warranted* the boots. Then it was realleged that certain chemicals were negligently compounded and the boots were of defective workmanship. Note, that the allegation is of *express warranty* of fitness.

A demurrer was filed, overruled as to the first cause of action and sustained as to the second. The cross-assignment of error is directed to the sustaining of the demurrer to the second cause of action.

An Opinion was first handed down in this Cause on September 30, 1965. Subsequently, that Opinion was withdrawn and rehearing granted limited to the cross-assignment of error recited above as to the correctness of the district court's ruling on the demurrer on the grounds that the second count did not state a cause of action.

We shall characterize the second count by calling it one of *express warranty* because that language was used and because all other allegations go to that. Additionally, the fact recital of distribution methods designed to reach the ultimate user was national in scope and by means of advertising to create a demand. It seems obvious that no *express warranty* could be established by such a method alleged.

After sustaining the demurrer to the second count, no attempt was made to amend the complaint, and for that matter, no subsequent effort to present the problem was attempted until by way of cross-assignment of errors.

Now, we have plaintiff as well as Amicus Curiae, (allowed by court order) asserting that an *implied warranty* of fitness may be imposed without the necessity of privity of contract. Excellent briefs and arguments are presented on the interesting question of a manufacturer's implied warranty of fitness to the ultimate user. But that question, as we have at-

tempted to show, is *not* this case as it was pleaded, presented and tried.

Cross-assignment of error number 2 goes to the limitation by the district court of the plaintiff's evidence. Plaintiff in his brief dwells at length on what he describes as 15 or 20 other cases identical to the one at bar, and claims that he should have been allowed to introduce evidence of other miners having similar symptoms after wearing boots manufactured by the defendant.

Aside from the fact that plaintiff's brief repeatedly refers to matters entirely apart from the record, no offer of proof was made to the district court. The matters were clearly collateral. Thus, without any offer of proof to indicate how, at least circumstantially, the matters would be probative, the district court was not in error in refusing to allow inquiry into such matters.

The other cross-assignments deal with instructions. No discussion thereon is deemed necessary since the jury verdict was for the entire amount of damages sought, so, even if error existed, it could not be prejudicial to plaintiff.

Reverting now to defendant's motions.

Rule 50(b), M.R.Civ.P., in part provides:

"* * * Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; * * *. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed."

We have adverted to the many deficiencies in the evidence, and if we were satisfied that these deficiencies could not be expected to be supplied or cured by any evidence upon a new

trial, the judgment should be affirmed. We have discussed at length the errors in admission of evidence, and have held certain instructions to have been in error.

While the procedural situation followed in Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849, is not the same as that followed in the instant case in that there the defendant after entry of judgment moved only for a new trial and the motion was denied. Upon appeal to the Circuit Court of Appeals that court held that the admission of certain evidence was prejudicial error and reversed the case, but instead of remanding for a new trial it directed entry of judgment for the defendant. The Supreme Court of the United States held that failure to make a motion in the district court for judgment notwithstanding the verdict, as permitted by Rule 50(b), precludes an appellate court from directing entry of such judgment. While the foregoing explanation has no application here, we do wish to quote from the Supreme Court's opinion as follows:

"Rule 50(b) contains no language which absolutely requires a trial court to enter judgment notwithstanding the verdict even though that court is persuaded that it erred in failing to direct a verdict for the losing party. The rule provides that the trial court 'may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed.' This 'either-or' language means what it seems to mean, namely, that there are circumstances which might lead the trial court to believe that a new trial rather than a final termination of the trial stage of the controversy would better serve the ends of justice. In short, the rule does not compel a trial judge to enter a judgment notwithstanding the verdict instead of ordering a new trial; it permits him to exercise a discretion to choose between the two alternatives. See Berry v. United States, supra, 312 U.S. 452, 453, 61 S.Ct. 638, 85 L.Ed. 945. And he can exercise this discretion with a fresh personal knowledge of the issues involved, the

kind of evidence given, and the impression made by witnesses. His appraisal of the bona fides of the claims asserted by the litigants is of great value in reaching a conclusion as to whether a new trial should be granted. Determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart. See March v. Philadelphia & West Chester Traction Co., 285 Pa. 413, 418, 132 A. 355 [357] ; Bunn v. Furstein, 153 Pa.Super. 637, 638, 34 A.2d 924. See also Yutterman v. Sternberg, 8 Cir., 86 F.2d 321, 324, 111 A.L.R. 736. Exercise of this discretion presents to the trial judge an opportunity, after all his rulings have been made and all the evidence has been evaluated, to view the proceedings in a perspective peculiarly available to him alone. He is thus afforded 'a last chance to correct his own errors without delay, expense, or other hardships of an appeal.' See Greer v. Carpenter, 323 Mo. 878, 882, 19 S.W.2d 1046, 1047; Cf. United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 466 [90 L.Ed. 562].

"There are other practical reasons why a litigant should not have his right to a new trial foreclosed without having had the benefit of the trial court's judgment on the question. Take the case where a trial court is about to direct a verdict because of failure of proof in a certain aspect of the case. At that time a litigant might know or have reason to believe that he could fill the crucial gap in the evidence. Traditionally, a plaintiff in such a dilemma has had an unqualified right, upon payment of costs, to take a nonsuit in order to file a new action after further preparation, unless the defendant would suffer some plain legal prejudice other than the mere prospect of a second lawsuit. Pleasants v. Fant, 22 Wall. 116, 122, 22 L.Ed. 780; Jones v. S. E. C., 298 U.S. 1, 19-20, 56 S.Ct. 654, 80 L.Ed. 1015, and cases cited. Rule 41(a) (1) preserves this unqualified right of the plaintiff to a dismissal without prejudice prior to

the filing of defendant's answer. And after the filing of an answer, Rule 41(a) (2) still permits a trial court to grant a dismissal without prejudice 'upon such terms and conditions as the court deems proper.' "

A footnote to the court's opinion is likewise pertinent and it reads:

"The Advisory Committee on Rules for Civil Procedure in commenting on Rule 50(b) stated that 'A trial court or an appellate court in setting aside a verdict always has discretion, if justice requires it, to order a new trial, instead of directing the entry of judgment. Rule 50(b) states that the court on a motion for judgment notwithstanding the verdict "may either order a new trial or direct the entry of judgment" for the moving party.' Report of Proposed Amendments to Rules of Civil Procedure (1946) 66. See also New York Symposium on Federal Rules (1938) 283-284. Compare March v. Philadelphia & West Chester Traction Co., 285 Pa. 413, 132 A. 355; Nadeau v. Maryland Casualty Co., 170 Minn. 326, 331, 212 N.W. 595 [597]; Anderson v. Newsome, 193 Minn. 157, 258 N.W. 157; Porsmer v. Davis, 152 Minn. 181, 188 N.W. 279; Jackson v. Hansard, 45 Wyo. 201, 218, 17 P.2d 659 [664]."

Having found error prejudicial to the defendant occurred upon the trial, we must exercise our discretion as to the proper disposition of this appeal.

We recognize in considering the bona fides of plaintiff's claim that Dr. Shields thought that the cause of plaintiff's trouble was the rubber boots; that plaintiff had never had any breaking out on his body previously but wound up in the hospital the third day after wearing the U. S. Rubber boots; that he wore another boot thereafter with no ill effects but on a second attempt to wear the U. S. Rubber boots again broke out and went back to the hospital. Had the court sustained the objections to the hypothetical questions, as properly it should have, plaintiff might have been able to eliminate the speculative elements contained in the questions, or, if not, at least he

would have been aware of his lack of proof and had an opportunity to otherwise supply it.

These circumstances impel us to the view that in the exercise of our discretion in this cause a new trial "would better serve the ends of justice."

The judgment is reversed and a new trial ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE DOYLE concur.

MR. JUSTICE JOHN C. HARRISON specially concurring:

I concur in the majority opinion. However, in view of the question of privity in Montana raised by Amicus Curiae in their arguments at the rehearing, I feel it desirable to comment further on the question in Montana.

I do not believe that the doctrine of privity should be a shield against a breach of warranty action. In fairness to the bench and bar of the state I would reserve for future cases the right to review the entire matter of privity in all cases of breach of warranty.

MR. JUSTICE ADAIR dissenting:

In my opinion the judgment entered in the district court in conformity with the verdict returned by the jury at the conclusion of the trial in the district court is right and just and that such verdict should be respected and that the judgment entered thereon by the trial judge should be affirmed by this, the appellate court. I therefore here respectfully register my dissent to the foregoing majority opinion in this cause.