330

HAROLD C. DAHL, GUARDIAN OF THE PERSON AND ESTATE OF RAIDOR DAHL, AN INCOMPETENT PERSON, PLAINTIFF AND RESPONDENT, *v.* NATIONAL HEALTH AND LIFE INSURANCE COMPANY, DEFENDANT AND THIRD-PARTY PLAINTIFF AND APPELLANT.

No. 11041.
Submitted September 15, 1966. Decided November 17, 1966.
420 P.2d 318.

Corette, Smith, Dean & Robischon, Kendrick Smith (argued), R. D. Corette, Jr., (argued), Butte, for appellant.

Habedank, Cumming & Best, Otto T. Habedank (appeared) Jacque W. Best (argued), Sidney, for respondent.

HONORABLE NAT ALLEN, District Judge, sitting for MR JUSTICE DOYLE, delivered the Opinion of the Court.

Plaintiff, Roger Dahl, guardian of Raidor Dahl, the insured, sues to recover on an insurance policy providing for payment for his hospital confinement in the sum of one thousand dollars per month which policy provided that "in the event of hospital residence occurring solely as the consequence of direct bodily injury resulting from any accident and independently of all other causes while this policy is in force." The lower court found for the plaintiff and defendant appeals. The facts giving rise to the action are as follows:

Josephine Lundquist was the owner and operator of a ranch near Bainville. She had known Raidor Dahl, the insured, for

about a year and he had lived and worked on the ranch and was physically capable of working. On the afternoon of May 2, 1964 the insured Raidor Dahl and Josephine Lundquist returned to her ranch and he "got disorderly" and he "went around and tore my bedroom all apart just like a maniac." He tore out the *telephone* too. Thereupon, Josephine grabbed her coat and ran for the car to get away because as she said, she "was frightened and he has frightened me again and again." She ran outside while Raidor was in the bathroom and jumped into her car, a 1962 four-door Pontiac, and got in the driver's seat and locked the doors and Raidor was "right out there quickly" right behind Josephine and he was hanging on to the handle at the front door with both hands and "I thought he was going to bust the window and that is why I pleaded with him to please, please, let loose of my door, please, because I don't want to hurt you, I says, and I didn't want to go any place in the first place, it was a dark night and it was raining and it was just awful outside." She rolled down the window about an inch so that he could hear her. Then she warned him to please step back out of the way that she was going to back out and go away from the ranch. She then backed up slowly and warned him again through the window that she was going ahead and to please let loose of the car. She backed up just a few feet to get away from a fence that was in front of her car and turned the wheels to drive the car out of the yard, and to quote her testimony:

"Q. Well now after you had backed up your car, was Raidor still hanging on to the door then? A. Well, I couldn't say that, because I don't know. I looked back and I warned him to stay away to get aside, but I still don't know, I looked back and forth up ahead.

"Q. And you didn't see him at that time? A. I didn't see him, I did not see him.

"Q. And then what did you do? A. Well I just went straight ahead and drove away.

"Q. Did you speed away? A. No, that is not my way of driving, I just went away normally. I started up ahead just the same way as I backed up, gently, that is the way I went and that is the way I drove away.

"Q. Did you feel any bumps or anything? A. No, no I couldn't feel nothing.

"Q. Did you look out the window to your left? A. Yes, but it was dark and raining.

"Q. Did you see anything? A. I couldn't see nothing."

She returned to the farm about seven a. m. and Raidor was not there. Roger Dahl, guardian of Raidor Dahl testified that in the early morning of May 3, 1964, he went to Josephine Lundquist's farm in response to a *telephone call* made by Raidor who told him over the *telephone* that he, Raidor, was hurt and hurt by a car and wanted to go to the hospital. He found Raidor all roughed up on the right side of his face, "was in sad shape" badly scratched and some blood in his hair. Thereupon his brother took him to the hospital in Williston. This happened on the 2nd of May. On the 4th of May Josephine went to the Williston hospital to see Raidor and he seemed to be getting along fine. Raidor was released from the hospital and drove home with Josephine. When they got back to the ranch Raidor asked Josephine to fry him a hamburger and he found a bottle with about five inches of liquor in it and drank it all down, "he never took it away from his mouth, he drank it all." When the liquor "grabbed" him he went to the bathroom, became sick and vomited and fell out of the bathroom on his right side with his body curled up and appeared to be unconscious. Roger Dahl again went to Josephine Lundquist's home on the 4th of May and found Raidor in the bathroom, his head being inside the bathroom, and he was unconscious. This time he took Raidor to his sister's place and put him in bed. Raidor was still unconscious. Roger Dahl testified that Raidor said that the car threw him as high as a telephone pole. Raidor Dahl himself was not able to testify because he could not re-

member what happened on May 2nd nor where he was that day and due to his brain damage he could not testify about anything at any time.

That Raidor was injured in some manner admits of no doubt. Dr. Schwidde testified he had a cranial cerebral trauma; that his condition was acute, and serious; that he later discovered a subdural hematoma and he made two brain operations upon Raidor, all of which consumed a great deal of time in the hospital.

Appellant makes three specifications of error, the first of which deals with a hypothetical question in the deposition of Dr. Schwidde:

"Q. Doctor, I ask you to assume that Raidor Dahl is now 52 years of age; no previous history of convulsions, operations, severe headaches, fractures or nervousness; that he does have a past history of alcoholism extending for approximately 12 years; that Mr. Dahl was involved in an *accident* on the night of May 2 or early morning of May 3, 1964; that at that time Mr. Dahl was attempting to enter an automobile and had grasped the left hand door handle; while he was thus holding on to the door handle the car was rapidly accelerated forward, wrenching his arm and throwing him to the ground where he struck his head."

Appellant contends that the hypothetical question asked in the deposition was based upon facts which plaintiff expected to prove in its case in chief and is now being asked subject to being connected up at the time of trial. Appellant contends that this was never done and cites Jangula v. United States Rubber Co., 147 Mont. 98, 410 P.2d 462, wherein this court stated: "The judgment of an expert will not support a verdict when opposed by undisputed facts and the dictates of common sense. Where, as here, the conclusions of the experts are based on facts which do not exist, or are the result of inference, admission *over objection* is erroneous." That rule in Jangula is quite proper but it has no application here since

there was no objection to the question the second time it was asked. After the first question was asked proper objection was made and a motion was made to strike the answer upon the grounds that by the use of the word "accident" the witness assumes a basic issue in this law suit and is prejudicial. Whereupon the doctor was asked the same question but the word "occurrence" substituted for the word "accident." The question was somewhat longer the second time it was asked, and wound up with "From these facts together with the results of your examination and treatment of Mr. Dahl, to which you have just testified, do you have an opinion, based on reasonable medical certainty as to whether or not there was a causal connection between the occurrence which I have described to you which took place on May 2nd or May 3rd, 1964 and the injury suffered by Mr. Dahl?"

"A. It is my opinion that there was a direct connection between the described occurrence and the injuries which I have outlined, which I observed and treated in this patient."

Thus there was no objection to the second question and appellant may not now be heard to object to it when he has not done so in the first instance. As to those parts of the question concerning his previous health, we think there was ample evidence from laymen of his previous good health, both from Roger Dahl and from Josephine Lundquist who testified.

"Q. Now prior to May, 1964, was Raidor able to do manual work on the farm? A. Well, he tried, he tried, and I thought he was going to be OK, but however, he never finished up nothing that he started.

"Q. But was he physically capable of working? A. Oh, yes, and how! You ain't a-kidding."

The insured's sister, Mrs. Lee Niles also testified that his health was good, and all this testimony was not disputed and it seems to the court that would negate any possibility of convulsions, fractures or nervousness. Nor can there be any doubt that the testimony from lay witnesses is sufficient to establish

good health. See Wigmore on Evidence Volume II Section 568, where the rule is stated as follows:

"While on matters strictly involving medical science, as such, some special skill is needed, yet there are numerous related matters, involving health and bodily soundness, upon which the ordinary experience of every-day life is entirely sufficient. The lines may sometimes be difficult to draw; but there can be no difficulty in determining that a layman may be received to state (for example) that a person was or was not apparently ill. Great liberality should be shown by the courts in applying this principle, so that the cause of justice may not be obstructed by narrow and finical rulings. * * * In the United States on the whole, narrow objections, though constantly made, are discountenanced, and a policy of considerable liberality is enforced."

■ There being no evidence to the contrary in the record, the district judge was bound to find that Raidor Dahl was in good health prior to the accident and the facts propounded in the hypothetical question were well founded.

■ Appellant next urges that the trial court committed error in finding and concluding that there was an accident; that the burden was on the plaintiff to prove that an accident occurred and there was insufficient evidence to support such a finding and conclusion. With this we cannot agree. In the pretrial order the following facts were admitted to be true and required no proof.

"1. That on or about the time the event occurred, Josephine Lundquist was sitting in the driver's seat in her automobile and Raidor Dahl was hanging on to her automobile. 2. That Josephine Lundquist drove her car forward, knocking Raidor Dahl to the ground."

We note parenthetically that different counsel appear on this appeal than appeared at the trial of the case.

The testimony showed that Raidor Dahl *telephoned* Roger Dahl shortly thereafter and Roger Dahl testified that the in-

sured told him he had been hurt by a car and wanted to go to the hospital and that when Roger Dahl arrived at the Lundquist farm, in answer to the question,

"Q. What did Raidor look like? A. Well he looked all roughed up, and the right side of his face was in sad shape. .

"Q. Could you describe what you mean by 'roughed up'? A. Well, he was badly scratched and I believe that he had some blood in his hair, he looked real rough."

He was then taken to the hospital and the history taken by the doctor was:

"He stated he had grabbed on to a car and as it started up, he was thrown aside. The patient complains of pain in the post neck and weakness of his left arm."

Doctor Schwidde found also "Rather remarkable weakness of the right arm." Dr. Schwidde attributed the injury to the upper arm and arm pit was such as would have been sustained by pulling or stretching the muscles. The bicep jerk test on the injured right arm was zero and in his left arm was a plus one, indicating a nerve interruption. Doctor Schwidde also testified that the minimization of jerk in the arms could be attributed to a blow on the head. Thus we think the evidence is ample to show that without a doubt the occurrence of an accident was proved by a preponderance of the evidence and the district court so found.

Defendant's third specification of error was that the trial court erred in finding that there was an accident because the plaintiff's proof demonstrated the plaintiff himself was the author of his own misfortune arising from drunkenness and arising from an attempted assault where plaintiff knew or must have been deemed to have known the consequences of hanging on to the door handle of a moving automobile and argues that the insured's injury must be deemed to have been reasonably foreseeable and the natural consequence of wrongful acts.

In the first place the testimony is not clear by any means that Raidor Dahl was drunk as appellant so freely contends. The

only evidence that he was drunk came from the testimony of Josephine Lundquist which has been set out heretofore. In Exhibit Two, which was admitted into evidence without objection, Josephine Lundquist made a signed statement to an investigator referring to the night of May 2nd, in which she says, "I do not believe he was drunk that night" referring to Raidor Dahl. Such a contradictory statement neutralizes the testimony of a witness and the lower court might well have found that he was stark sober. See State v. Troffer, 109 Mont. 275, 97 P.2d 336.

Appellant cites Terry v. National Farmers Union Life Insurance Company, 138 Mont. 333, 356 P.2d 975 as approving the test of actual foreseeability as an issue of fact to be answered in the light of the circumstances of the individual case. This is true. In the case at bar the case was tried without a jury and foreseeability was argued to the court and the court found in finding No. 7, that:

"Raidor Dahl was accidentally injured and thereafter required and received hospitalization as a consequence of direct bodily injury resulting from an accident and independently of all other causes."

We see no conflict between the theory of the Terry case and the theory upon which this case was decided except one was decided by a jury and the case at bar was decided by the district judge. Further, the Terry case involved a fist fight that ensued after an argument over a card game and it would seem to this court that the foreseeability of injury or death is much greater to one who engages in a fist fight than one who grasps the door handle of a car that thereafter moved.

The policy here of course, simply used the word "accident" in defining its liability, most other policies use the words "accidental means" and many courts have drawn a distinction between the policy using the word "accident" and policies using the words "accidental means." The policy in the Terry case used the phrase "accidental means." While the briefs deal with this distinction at great length we fail to observe where it

would make any difference. For a discussion of the proposition see 29 Am.Jur. Sec. 1166.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, ADAIR and CASTLES, concur.